CULLEN AND DYKMAN LLP
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
(516) 357-3700
Matthew Roseman, Esq.
Kelly McNamee, Esq.

*Attorneys for Carver Federal Savings Bank*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------------x
                                              :
In re:                                        :    Chapter 11
                                              :
NEW YORK BEACH CLUB LTD.,                      :    Case No. 26-70576 (LAS)
                                              :
                    Debtor.                    :
                                              :
-----------------------------------------------------------------------x
```

**NOTICE OF MOTION FOR ORDER (A) (I) APPOINTING CHAPTER 11
TRUSTEE OR, ALTERNATIVELY, (II) CONVERTING DEBTOR'S CASE OR,
ALTERNATIVELY, (III) VACATING THE AUTOMATIC STAY AND EXCUSING THE
RECEIVER'S COMPLIANCE WITH 11 U.S.C. § 543**

**PLEASE TAKE NOTICE** that, on **March 26, 2026 at 10:00 a.m.**, Carver Federal

Savings Bank ("**Carver**"), by and through its undersigned counsel, will move before the

Honorable Louis A. Scarcella, United States Bankruptcy Judge, in the United States Bankruptcy

Court for the Eastern District of New York at the United States Bankruptcy Court for the Eastern

District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip,

New York, 11722 on **March 26, 2026 at 10:00 a.m.**, or as soon thereafter as counsel can be heard,

for its motion for entry of an order (A) (I) to appoint a Chapter 11 trustee in the above-captioned

Debtor's case or, alternatively, (II) to convert the Debtor's case to one under Chapter 7 of the

Bankruptcy Code or, alternatively (III) to vacate the automatic stay and excuse the Receiver's

compliance with 11 U.S.C. § 543 (the "**Motion**")

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the relief sought in the Motion shall be made in writing, shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Eastern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Eastern District of New York; and (c) be filed electronically with the Court by registered users of the Court's electronic filing system in accordance with all General Orders applicable to Chapter 11 cases in the United States Bankruptcy Court for the Eastern District of New York available on the Court's website at (http://www.nyeb.uscourts.gov) so as to be so filed and received by no later than **March 19, 2026 at 4:00 p.m.** ("**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE**, that the hearing shall be held in person, but anyone wishing to listen to a hearing or participate remotely must register with eCourt Appearances. Information on how to register for, and use, the eCourt Appearance tool is available at https://www.nyeb.uscourts.gov/registering-remote-hearing-appearance-using-ecourt-appearances. For clarification, for a hybrid "Zoom/in-person" hearing, parties appearing remotely by Zoom and parties appearing in-person, must register with eCourt Appearances. **In either case, the party should register on or before 12:00 noon the day prior to the scheduled hearing.**

Dated: Uniondale, New York
February 23, 2026

**CULLEN AND DYKMAN LLP**

By:    */s/ Matthew G. Roseman*
       Matthew G. Roseman, Esq.
       Kelly McNamee, Esq.
333 Earle Ovington Boulevard, 2nd Fl.
Uniondale, New York 11553
Telephone: (516) 357-3700
Email: mroseman@cullenllp.com
       kmcnamee@cullenllp.com

*Attorneys for Carver Federal Savings Bank*

CULLEN AND DYKMAN LLP
333 Earle Ovington Blvd., 2nd Floor
Uniondale, New York 11553
(516) 357-3700
Matthew G. Roseman, Esq.
Kelly McNamee, Esq.

*Attorneys for Carver Federal Savings Bank*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
                                                                     :
In re:                                                               :    Chapter 11
                                                                     :
NEW YORK BEACH CLUB LTD.,                                             :    Case No. 26-70576 (LAS)
                                                                     :
                          Debtor.                                    :
                                                                     :
---------------------------------------------------------------------x

**MOTION FOR ORDER (A) (I) APPOINTING CHAPTER 11 TRUSTEE OR, ALTERNATIVELY, (II) CONVERTING DEBTOR'S CASE OR, ALTERNATIVELY, (III) VACATING THE AUTOMATIC STAY AND EXCUSING THE RECEIVER'S COMPLIANCE WITH 11 U.S.C. § 543**

TO:    THE HONORABLE LOUIS A. SCARCELLA,
       UNITED STATES BANKRUPTCY JUDGE

Carver Federal Savings Bank ("**Lender**" and/or "**Carver**"), by its counsel Cullen and Dykman LLP, as and for its motion (A) (I) to appoint a Chapter 11 trustee in the above-captioned Debtor's case or, alternatively, (II) to convert the Debtor's case to one under Chapter 7 of the Bankruptcy Code or, alternatively (III) to vacate the automatic stay and excuse the Receiver's compliance with 11 U.S.C. § 543 (the "**Motion**"), respectfully alleges as follows:

**INTRODUCTION**

1.     On February 10, 2026 (the "**Petition Date**"), New York Beach Club Ltd. ("**NYBC**") and Ocean Blvd., LLC ("**Ocean**", and together with NYBC, the "**Debtors**")[1] each

---

[1] Ocean has simultaneously filed for chapter 11 bankruptcy relief in this Court, Case No. 26-70577. As such, this Motion is being filed under both cases, as the Debtors are obligated to Carver for both commercial mortgages held on the Mortgaged Property.
35479535.v3

filed a voluntary petition for relief under chapter 11 of title 11, United States Code, 11 U.S.C. § 101 *et seq*. (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Eastern District of New York.

2.      Alexander V. Jacobson is the president of the Debtors ("**Jacobson**" and/or "**Shareholder**").

3.      Carver holds a blanket lien on two commercial mortgages (as described more fully below) that encumbers real and personal property situated in Atlantic Beach, Town of Hempstead, County of Nassau and State of New York, designated as Section: 58, Block: 32 and Lots: 1-20, 21-25 and 26-30 and Section: 58, Block: E, Lots: 131 and 132 on the Tax Map of Nassau County, New York, known as and by the street address, 1751 Ocean Boulevard, Atlantic Beach, New York 11509 (the "**Mortgaged Property**").

4.      NYBC is the holder of a leasehold interest in the Mortgaged Property (the "**Leasehold Estate**") pursuant to an unrecorded operating lease between NYBC as tenant and Ocean as landlord (the "**Operating Lease**").

5.      Ocean is the owner of and holder of a fee interest in the Mortgaged Property (the "**Fee Estate**").

6.      Each of the Mortgages (as defined below) encumbers both the Leasehold estate and Fee Estate.

7.      The subject Mortgaged Property is a beach club, which upon information and belief, has hundreds of members ("**Beach Club Members**").  The Beach Club Members pay yearly membership fees each season ("**Membership Funds**").

8.      No trustee, examiner or creditors' committee has been appointed in the Debtors case and the Debtors continue in possession of their property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2

## PRELIMINARY STATEMENT

9. Throughout the Foreclosure Action (defined below), the Debtors and Jacobson have exhibited conduct that has set the tone for this chapter 11 bankruptcy.

10. As explained in further detail below, order after order that was handed down in the Foreclosure Action was willingly violated by Jacobson without any regard. Jacobson exhibited a course of conduct where, despite court Orders, he was going to do what he wanted to do. Even the threat of incarceration was not going to phase him. *See Affirmation of Alexander Jacobson* and *Affirmation and Memorandum of Law in Support of Defendant's Order to Show Cause* (the "**Affirmation**") attached as **Exhibit 1** to the Roseman Declaration ("The fact that the threat of incarceration is incrementally short of immediate should be of no moment.").

11. It is this cavalier demeanor and untrustworthiness exhibited by Jacobson throughout the Foreclosure Action (defined below) that necessitates Carver to bring the instant Motion, so that it may protect its interest in the Mortgaged Property. The pre-petition conduct of Jacobson has been erratic, contemptuous and will likely continue during the pendency of this bankruptcy case.

12. Therefore, it is respectfully submitted that the Court grant the relief requested in the Motion.

## THE LOAN DOCUMENTS

### Loan A

13. On or about March 31, 2022, Lender made a loan to the Debtors in the original principal amount of Seven Million Two Hundred Seventy-Five Thousand and 00/100 Dollars ($7,275,000.00) ("**Loan A**").[2]

---

[2] The facts herein are as attested to in the Affidavit of Patrick Doulin (the "**Doulin Affidavit**") and the Declaration of Matthew G. Roseman (the "**Roseman Declaration**"), submitted simultaneously with the Motion

3

14.    To evidence its indebtedness under Loan A, on or about March 31, 2022, the Debtors, for value received, executed, acknowledged and delivered to the Lender, a *Consolidated, Amended and Restated Promissory Note* ("**Loan A Note**"), in the original principal amount of Seven Million Two Hundred Seventy-Five Thousand and 00/100 Dollars ($7,275,000.00) with interest thereon at the rates therein provided, and promised to pay said amount plus interest thereon to Lender.  A true and correct copy of the Loan A Note is attached to the Doulin Affidavit as **Exhibit A**.

15.    To secure payment of the Loan A Note, on or about March 31, 2022, the Debtors, for value received, executed, acknowledged and delivered to Lender, a *Consolidation, Spreader, Extension and Modification Agreement* (the "**Loan A Mortgage**"), in the original principal amount of Seven Million Two Hundred Seventy-Five Thousand and 00/100 Dollars ($7,275,000.00), securing a first mortgage lien on the Mortgaged Property.  The Loan A Mortgage was recorded on October 27, 2022, in the Nassau County Clerk's Office in Liber 46920 at page 304 *et seq*. and was duly indexed according to law and the tax, if any, imposed by law upon the recording thereof was duly paid.  A true and correct copy of the Loan A Mortgage is attached to the Doulin Affidavit as **Exhibit C**.

16.    As additional security for the payment of Loan A from the Debtors, Jacobson, for value received, executed, acknowledged and delivered to the Lender, a *Guaranty Agreement* dated as of March 31, 2022, wherein, Jacobson guaranteed all obligations, indebtedness and other liabilities of the Debtors ("**Loan A Guaranty**").  A true and correct copy of the Loan A Guaranty is attached to the Doulin Affidavit as **Exhibit K**.

17.    The Loan A Note, Loan A Mortgage, and Loan A Guaranty, together with all other loan documents relating to Loan A as set forth in further detail in the Doulin Affidavit are referred to collectively herein as the "**Loan A Documents**".

4

**Loan B**

18.     On or about March 31, 2022, Lender made another loan to the Debtors in the original principal amount of Nine Hundred Twenty-Five Thousand and 00/100 Dollars ($925,000.00) ("**Loan B**", and collectively with Loan A, the "**Loans**").

19.     To evidence its indebtedness under Loan B, on or about March 31, 2022, the Debtors, for value received, executed, acknowledged and delivered to the Lender, a *Promissory Note* ("**Loan B Note**", and together with the Loan A Note, the "**Notes**"), in the original principal amount of Nine Hundred Twenty-Five Thousand and 00/100 Dollars ($925,000.00) with interest thereon at the rates therein provided, and promised to pay said amount plus interest thereon to Lender.  A true and correct copy of the Loan B Note is attached to the Doulin Affidavit as **Exhibit L**.

20.     To secure payment of the Loan B Note, on or about March 31, 2022, the Debtors for value received, executed, acknowledged and delivered to the Lender, a *Mortgage, Assignment of Leases and Rents and Security Agreement* ("**Loan B Mortgage**", and together with the Loan A Mortgage, the "**Mortgages**"), in the original principal amount of Nine Hundred Twenty-Five Thousand and 00/100 Dollars ($925,000.00), securing a second mortgage lien against the Mortgaged Property.  The Loan B Mortgage was recorded on October 31, 2022, in the Nassau County Clerk's Office in Liber 46925 at page 940 *et seq*. and was duly indexed according to law and tax, if any, imposed by law upon recording thereof was duly paid.  A true and correct copy of the Loan B Mortgage is attached to the Doulin Affidavit as **Exhibit M**.

21.     Pursuant to the Loan B Mortgage, Debtors granted a security interest in the Collateral (as defined in the Loan B Mortgage).

22.     As additional security for the payment of Loan B from the Debtors, Jacobson for value received, executed, acknowledged and delivered to the Lender, a *Guaranty Agreement*,

5

35479535.v3

dated as of March 31, 2022, wherein Jacobson guaranteed all obligations, indebtedness and other liabilities of the Debtors ("**Loan B Guaranty**", and together with the Loan A Guaranty, the "**Guaranties**"). A true and correct copy of the Loan B Guaranty is attached to the Doulin Affidavit as **Exhibit S**.

23. The Loan B Note, Loan B Mortgage, and Loan B Guaranty, together with all other loan documents relating to Loan B as set forth in further detail in the Doulin Affidavit are referred to collectively herein as the "**Loan B Documents**" (collectively, with the Loan A Documents, the "**Loan Documents**").

24. The Debtors and Jacobson failed to comply with the terms of Loan A Note and Loan A Mortgage by failing to make the monthly payments required thereby, of principal, interest and escrow, which became due on September 1, 2023 and on the first day of each month thereafter ("**Loan A Payment Default**").

25. The Debtors and Jacobson failed to comply with the terms and provisions of the Loan B Note and Loan B Mortgage by failing to make the monthly payments required thereby, of principal, interest and escrow, which came due on December 1, 2023 and on the first day of each month thereafter ("**Loan B Payment Default**").

## FORECLOSURE ACTION

26. On March 26, 2024, based on the Debtors' Defaults under the Loan Documents, Lender commenced an action to foreclose the Mortgages by filing a Summons, Verified Complaint, and Notice of Pendency ("**Complaint**") in the Office of the Clerk of the County of Nassau, under Index No. 605303/2024 (the "**Foreclosure Action**").

27. By order dated December 23, 2024 and entered December 26, 2024, the court in the Foreclosure Action entered *Short Form Order* (the "**Short Form Order**"), denying Carver's

6

Summary Judgment Motion and granting Debtors' Cross-Motion.[3]  A true and correct copy of the Short Form Order is attached to the Roseman Declaration as **Exhibit 2**.

28.     According to the Short Form Order, the Honorable Jerome C. Murphy explained that there were questions of fact on whether defendants were actually behind on their payments. Additionally, Judge Murphy explained that the members of the Mortgaged Property should be named as parties because they "start pre-paying for their cabanas and lockers months before the club opens in May of each year.  However, none of these individuals are named as parties and none have been served.  The motion papers indicate that there may be 1200 member/renters. Clearly, they have rental agreements and an interest in this proceeding, including what will happen to their rents.  Thus, they are necessary parties to this proceeding, who should have been given a say in this motion. . . ." *See* Ex. 2 (Short Form Order).

29.     By motion dated January 24, 2025 ("**Reargue Motion**"), Carver sought entry of an order for leave to reargue the Short Form Order, which denied Carver's Summary Judgment Motion

30.     By order dated June 11, 2025 and entered June 16, 2025 (the "**June 16, 2025 Order**"), the court in the Foreclosure Action granted Carver's Reargue Motion.  A true and correct copy of the June 16, 2025 Order is attached to the Roseman Declaration as **Exhibit 3**.

31.     According to the June 16, 2025 Order, Judge Murphy found that the Debtors and Jacobson did default under the Loan Documents and explained that "[t]he Court should not have found on liability grounds that these 3 defendants were not obligated to the plaintiff on these accelerated debts". *See* Ex. 3 (June 16, 2025 Order).  However, Judge Murphy would not enter

---

[3] By motion dated July 30, 2024 ("**Summary Judgment Motion**"), Carver sought, *inter alia*, entry of an order granting summary judgment on its Complaint.  In response, Debtors and Jacobson filed *Notice of Cross-Motion* and *Memorandum in Opposition to Motion and in Support of Cross-Motion*, seeking entry of an order allowing Debtors to file a Second Amended Verified Answer and denial of Carver's Summary Judgment Motion.

7

judgment on the unnamed members since the tenancy term does not end until September of 2025.

32.    Additionally, pursuant to the June 16, 2025 Order, Judge Murphy further ordered that "[i]n the interim, it is ORDERED that the parties and their agents are not to enter into any further rentals for the 2026 season without permission of the Court." *See* Ex. 3 (June 16, 2025 Order).

33.    As set forth in the Roseman Declaration, the Debtors never made an application for permission to sell memberships, and in fact, did sell memberships and collected in excess of $900,000.00 in Membership Funds.  This was a direct violation of several court orders.  Upon discovering the Debtors' contemptuous conduct, counsel for Carver advised the court by letter dated July 22, 2025, which is annexed as **Exhibit 4** to the Roseman Declaration.  In response to counsel's letter, the Court scheduled a hearing and directed Jacobson to appear.

34.    On August 27, 2025, a hearing (the "**August 2025 Hearing**") was held regarding the conduct of the defendants.  At the August 2025 Hearing, Jacobson testified under oath.  The transcript from the August 2025 Hearing was so-ordered, therefore rendering any directions from Judge Murphy an order of the court (the "**So-Ordered Transcript**").  A true and correct copy of the So-Ordered Transcript is attached to the Roseman Declaration as **Exhibit 5**.

35.    At the August 2025 Hearing, Judge Murphy questioned Jacobson if he has been collecting Membership Funds in violation of the June 16, 2025 Order, to which Jacobson admitted that he has.  *See* Ex. 5 (So-Ordered Transcript at pp. 16-33).  Judge Murphy ordered Jacobson again, "[Y]ou are not to take anymore deposits; and if you get a deposit, you return it. You weren't allowed to take deposits since June and you've been violating my order.  Every time you violate my order is another violation." *See* Ex. 5 (So-Ordered Transcript at pp. 43-44).

8

36.     By *Decision & Order* dated October 28, 2025 and entered October 29, 2025 and *Order Granting Summary Judgment, Default Judgment, Order of Reference and Amendment of Caption* dated October 28, 2025 (together, the "**Order of Reference**"), the court granted the Renewal Motion on the grounds of liability and appointed a referee to compute the amounts due under the Notes and Mortgages.[4]  A true and correct copy of the Order of Reference is attached to the Roseman Declaration as **Exhibit 6**.

37.     Additionally, pursuant to the Order of Reference, the Debtors and Jacobson were further ordered not to issue any new memberships, reiterating the June 16, 2025 Order. *See* Ex. 6 (Order of Reference).

38.     In light of the Debtors continued violation of Judge Murphy's orders, Lender moved for the appointment of a receiver.  On January 15, 2026, the court entered *Order Appointing a Temporary Receiver*, whereby the court named Michael Sepe as receiver ("**Receiver**") of the Mortgaged Property ("**Receiver Order**")[5].  A true and correct copy of the Receiver Order is attached to the Roseman Declaration as **Exhibit 7**.

39.     According to the Receiver Order, the Receiver was appointed "with the usual powers and directions as the Temporary Receiver for the benefit of [Carver] of all rents and profits now due and to become due (including deposits and payments towards the 2026 rents) during the pendency of this action. . . ." *See* Ex. 7 (Receiver Order).

40.     Due to the Debtors and Jacobson's continuing failure to comply with the court's Orders, the Receiver filed *Order to Show Cause* seeking to hold Debtors and Jacobson in civil

---

[4] By motion dated December 24, 2025, Carver filed *Notice of Motion for Confirmation of Referee's Report & Judgment of Foreclosure & Sale* ("**Foreclosure Sale Motion**").  By the Foreclosure Sale Motion, Carver sought, *inter alia*, confirmation of the Referee's Oath and Report of the amount due to Carver by the Debtors.  According to the Referee's Oath and Report, there is due and owing $10,235,657.55 with interest through November 28, 2025.  A true and correct copy of the Referee Oath and Report is attached to the Roseman Declaration as **Exhibit 8**. As of the date of the bankruptcy filing, the Foreclosure Sale Motion was fully submitted.
[5] The June 16, 2025 Order, So-Ordered Transcripts, Order of Reference and the Receiver Order are collectively, the "**Orders**".

35479535.v3

and/or criminal contempt of the court's prior Orders and ordering of funds to be turned over to the Receiver. The court entered the Order to Show Cause on February 4, 2026 and scheduled a hearing to hold the defendants in the Foreclosure Action in contempt. Not surprisingly, the Debtors filed Chapter 11 on February 10, 2026, the day that Jacobson was directed to appear before Judge Murphy in response to the Receiver's application to hold the defendants in contempt. A copy of the Receiver's motion is attached to the Roseman Declaration as **Exhibit 9**.

41.     Additionally, it appears that the Debtors have spent a significant portion of the Membership Funds. As set forth in the court transcript of January 9, 2026 ("**January 2026 So-Ordered Transcript**" and together with the So-Ordered Transcript, the "**So-Ordered Transcripts**"), annexed to the Roseman Declaration as **Exhibit 10**, Debtors' counsel advised the court that the Debtors collected over $900,000.00 from over 600 individuals. *See* Ex. 10 (January 2026 So-Ordered Transcript at p. 15). However, the Debtors identifies $752,000.00 in its Bankruptcy Petition and Schedules [ECF No. 1]. As Carver transferred approximately $576,000.00 to the Receiver, pursuant to his lawful demand, and Debtor scheduled that $184,134.16 in two Chase accounts. Accordingly, there is at least $150,000.00 unaccounted for. It is apparent that the Debtors have spent the money and to avoid accounting for the funds collected and expended in direct contravention of the court Orders, the Debtors sought refuge in this Court.

42.     Throughout the Foreclosure Action, Jacobson has repeatedly and blatantly violated the court's Orders. He has solicited Membership Funds and collected money deposits from Beach Club Members despite court Orders not to. It further appears that the Debtors further violated Judge Murphy's orders by spending a portion of the Membership Funds they were directed to hold. *See* Ex. 5 (So-Ordered Transcript at pp. 43-44).

10

43.    It is evident that Jacobson's past violation of court orders, interference with the Receiver's duties obstructed the resolution of many of the issues which plagued the Mortgaged Property and jeopardized Carver's interest therein.  Jacobson's pattern of conduct – and history is a strong indicator of future performance – suggests that he will continue to so act and interfere with the Mortgaged Property, harming Carver's and other creditors' interests in the Mortgaged Property and in the instant chapter 11 case.

44.    As demonstrated below and in the affidavits filed in connection with this Motion, this Court should either appoint an operating trustee in the Debtors' case or convert this case to chapter 7 or, if it is not inclined to do so, vacate the automatic stay and excuse the Receiver from compliance with section 543 of the Bankruptcy Code to carry out the duties of the Receiver set forth in the Receiver Order.

**LEGAL ARGUMENT**

**GROUNDS EXIST TO APPOINT A CHAPTER 11
TRUSTEE IN THIS CASE PURSUANT TO
SECTION 1104(a) OF THE BANKRUPTCY CODE**

45.    Section 1104(a) of the Bankruptcy Code authorizes the court to appoint a trustee to serve in a chapter 11 case "for cause," or "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. §1104(a)(1)-(2). The appointment of a trustee is an "extraordinary remedy," and, therefore, the movant must prove the need for a trustee by clear and convincing evidence. *In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 108 (Bankr. S.D.N.Y. 2008); *see Adams v. Marwil (In re Bayou Grp., LLC)*, 564 F.3d 541, 546 (2d Cir. 2009) (noting that the standard under section 1104(a) is "very high"); *In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015). While courts usually presume that the debtor is in the best position to operate its business, "this presumption is not absolute." *Ashley River Consulting, LLC*, 2015 WL

11

1540941, at *8; *see In re SunCruz Casinos, LLC*, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003) ("[I]n the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." (quoting *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)) (internal quotation marks omitted)); *see also In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 818 (Bankr. N.D.N.Y. 1989) ("Chapter 11 is not a game to be used for sport against creditors for the benefit of insiders.") (motion to convert).

## The Pre-petition Conduct of the Debtor and Jacobson Constitute Grounds to Grant the Relief Requested

46.    "Cause" under section 1104(a)(1) includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case . . .." 11 U.S.C. §1104(a)(1). Additionally, courts consider the following factors (or some variation thereof) when determining whether there is sufficient cause:

> the materiality of any misconduct, the debtor-in-possession's evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors, the existence of pre-petition voidable preferences or fraudulent conveyances, whether any conflicts of interest on the part of the debtor-in-possession are interfering with its ability to fulfill its fiduciary duties, and whether there has been self-dealing or squandering of estate assets.

*Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship)*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011) (quoting *In re Veblen W. Dairy LLP*, 434 B.R. 550, 553 (Bankr. D.S.D. 2010)) (emphasis added).  While the "for cause" determination is discretionary and made on a case-by-case basis, the appointment of a trustee is mandatory once cause is established. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).

47.    Alternatively, the court may appoint a trustee if doing so is in the interests of creditors and the public. 11 U.S.C. §1104(a)(2); *see In re Ionosphere Clubs, Inc.*, 113 B.R. 164,

12

35479535.v3

168 (Bankr. S.D.N.Y. 1990). Factors that guide the court's analysis under subsection (a)(2) include the following:

> (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

Id. at 168. Subsection (a)(2), provides a "flexible standard," that permits appointment "even when no 'cause' exists." *Id.*; *see Ridgemour Meyer Properties, LLC*, 413 B.R. at 113 ("Unlike §1104(a)(1), §1104(a) (2) does not require a finding of fault . . ..". Because a debtor in possession owes fiduciary duties to the estate, the appointment of a trustee pursuant to section 1104(a)(2) is appropriate when the debtor "suffer[s] from material conflicts of interest and cannot be counted on to conduct independent investigations of questionable transactions in which [it was] involved." *Ridgemour Meyer Properties, LLC*, 413 B.R. at 113; *see In re Microwave Products of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) ("[B]ecause the debtor is not in a strong posture to pursue possible claims that may have resulted from conflicts of interest and fraudulent transfers, a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate."); *see also In re Eurospark Indus., Inc.*, 424 B.R. 621, 629 (Bankr. E.D.N.Y. 2010) ("It is well established that courts may appoint a chapter 11 trustee where a debtor-in-possession's management has a conflict of interest that interferes with its ability to fulfill its fiduciary duties to the estate.").

48.     Evidence of fraudulent pre-petition transfers made by a debtor—especially when for the benefit of "insiders"—is usually sufficient to satisfy a movant's burden under one or both subsections of 1104(a). *See Veblen W. Dairy LLP*, 434 B.R. at 554 (finding cause to appoint a trustee when the debtor, among other things, used its funds to pay down debt owed by a related entity) ("Debtor's and its management team's pre-petition actions were not evenhanded and were

13

primarily intended to benefit insiders and the several affiliated entities, rather than Debtor's creditors."); *Ridgemour Meyer Properties, LLC*, 413 B.R. at 113 (holding, inter alia, that the debtor's president was not a proper fiduciary because he could not be expected to investigate and recover transfers from the debtor to insiders, including the president's fiancé); *Microwave Products of Am., Inc.*, 102 B.R. at 676; *In re Bonded Mailings, Inc.*, 20 B.R. 781, 786 (Bankr. E.D.N.Y. 1982) (finding cause for the appointment of a trustee when the debtor transferred assets pre-petition to frustrate creditor in the satisfaction of its judgment); *In re Fiesta Homes of Georgia, Inc.*, 125 B.R. 321, 324 (Bankr. S.D. Ga. 1990) (holding that there were sufficient grounds to appoint a trustee under subsection (2) of section 1104(a) of the Bankruptcy Code because substantial transfers were made to insiders and the debtor's management had a conflict of interest, but ultimately the court converted the case to chapter 7 because the debtor was no longer operating).

49.     Under the foregoing standard, grounds exist under both sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code to appoint an operating trustee in this case. Based on the historical and continuing conduct of the Debtors and Jacobson, including collecting of Membership Funds in direct contradiction of court Orders in the Foreclosure Action, it is clear that the Debtors will not be able to efficiently administer this case. *See In re 1031 Tax Group, LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) ("The appointment of a chapter 11 trustee is authorized upon the showing of cause – inclusive of fraud, dishonesty, incompetence or gross mismanagement of the debtor's affairs by *current management*.") (emphasis not added).

50.     The Shareholder, who is still in control of the Debtors, has violated multiple Orders from the Foreclosure Action.  Jacobson has violated the June 16, 2025 Order, the So-Ordered Transcripts, the Order of Reference and the Receiver Order.  The Shareholder is still in

14

35479535.v3

violation of the Orders as Membership Funds are still being collected.  It is believed that approximately $900,000.00 in Membership Funds have been collected.

51.      Besides Carver being harmed through Jacobson's actions, the innocent Beach Club Members are also being significantly harmed.  Jacobson has not returned any of the Membership Funds to the Beach Club Members despite contractually being obligated to do so and by court Orders.  Jacobson admitted in his Affirmation filed in the Foreclosure Action that the Debtors are contractually obligated to return the Membership Funds if the Mortgaged Property does not open for the 2026 season. *See* Ex. 1 (Affirmation). Besides the contractual obligations the Shareholder has to return the Membership Funds, Judge Murphy ordered Jacobson at the August 2025 Hearing to return any deposit that he receives. *See* Ex. 5 (So-Ordered Transcript at pp. 43-44) ("[Y]ou are not to take anymore deposits; and if you get a deposit, you return it.")  Despite this unambiguous, straight-forward Order, Jacobson still refuses to comply.  The Shareholder is in violation of his contractual obligations, along with court Order violations.

52.      Furthermore, besides the Order to Show Cause filed by the Receiver seeking contempt against Jacobson due to failure to abide court Orders, the court in the Foreclosure Action has also threatened criminal contempt actions against Jacobson.  Judge Murphy stated at the August 2025 Hearing, "[b]ut if you continue to take money and these people do not get their money back, I'm going to have a real problem.  And I will seek criminal referrals against you. . . I'm not going to let these people be out of pocket." *See* Ex. 5 (So-Ordered Transcript at p. 44).

53.      As set forth in the January 2026 So-Ordered Transcript, Judge Murphy was still considering holding Jacobson in contempt due to his failure to abide by court Orders.  Judge Murphy stated to Jacobson's counsel, "In my prior order, I directed - - I ordered that your client not collect any rents because there were future rents.  Your client did that. . . .I felt that was

15

contemptible, and with your client here I told him exactly how I felt. I told him I was considering sending that over to Nassau County District Attorney and U.S. Attorney because he was collecting funds that he was ordered not to. . . .I'd like to get this resolved in an amicable way without pursing contempt and without pursuing turning things over to the DA and the U.S. Attorney." *See* Ex. 10 (January 2026 So-Ordered Transcript at pp. 7-8).

54.    It is clear that the Debtors filing of this bankruptcy case is a scheme to stop the criminal referrals that are justly and imminently coming Jacobson's way.

55.    It is this blatant disregard for the law and dishonesty from the Shareholder that necessitates a chapter 11 trustee to be appointed. By his actions throughout the Foreclosure Action, Jacobson has made it clear that he will take any action that he deems fit, including violating the law. This pattern of recklessness will not stop now that the Debtors have filed for bankruptcy.

56.    It cannot be overemphasized the serious nature of the Shareholder's actions thus far. There are too many parties involved who have been harmed, continue to be harmed, and will be harmed in the future if a chapter 11 trustee is not appointed. This self-dealing, dishonesty and mismanagement requires that the Debtors' operations be managed by a chapter 11 trustee. Thus, cause exists to appoint a chapter 11 trustee. *See In re 1031 Tax Group,* 374 B.R. at 86 ("A court may consider both the pre- and postpetition misconduct of the current management when making the determination that 'cause' exists for the appointment of a trustee.").

**Management of the Debtor is Hopelessly Conflicted Mandating the Appointment of a Trustee**

57.    It is also in the best interest of the creditors and the public to appoint an operating trustee under section 1104(a)(2) of the Bankruptcy Code. The Debtors cannot be counted on to

16

conduct independent investigations of any transfers to which Jacobson was a party, to fulfill its fiduciary duties to the estate, and cannot be deemed an honest participant.

58.     The Court should take notice that there are 3 categories of creditors in this case (i) Carver's secured claim on ostensibly all of the Debtors' assets; (ii) the $5,000,000.00 unsecured guaranty claim of Newtek Small Business Finance LLC ("**Newtek**"); and (iii) the collective claims of Beach Club Members.  Based upon the conduct in the Foreclosure Action, Carver has no confidence in the Debtors or Jacobson.  It is further submitted, that Jacobson is conflicted from representing the Debtors' estate related to the claims of Newtek or the Beach Club Members.

59.     It is respectfully averred that cause exists to appoint a trustee to investigate any transfers that Jacobson has made.  The Debtors Bankruptcy Petition and Schedules raise numerous concerns.  First, the Debtors list a $5,000,000.00 claim held by Newtek Small Business Finance LLC for a guaranty on a mortgage debt.  Second, the Debtors list a pending lawsuit for breach of contract (assuming on the guaranty of the Debtors) captioned *Newtek Small Business Finance, LLC v. New York Equestrian Center, Ltd.; Lakewood Ranch Estate LLC; Ocean Blvd., LLC; New York Beach Club, Ltd.; Jacobson Realty, Ltd.*, Index No. 606852/2025 pending in Nassau County Supreme Court.  Finally, the Debtors schedule debt for the benefit of New York Equestrian Center, Ltd.  [ECF No. 1] on account of a loan guaranty. Upon information and belief, that is an entity owned by the Jacobson's wife.

60.     It is respectfully submitted that it is necessary that a trustee be appointed to investigate any and all transfers from the Debtors to or for the benefit of New York Equestrian Center, Ltd. A trustee needs to investigate whether any transfers were made to Newtek Small Business Finance LLC and/or New York Equestrian Center, Ltd., and if these transfers constitute

a fraudulent conveyance.  Only a trustee can make an independent finding of a fraudulent conveyance; the Debtors certainly cannot.

61.    With regard to the claims of the Beach Club Members, it is clear that the funds attributable to those claims were collected in direct violation of several court orders.  This may raise issues regarding Jacobson's personal liability to the Beach Club Members and would further conflict his ability to represent the interests of the Debtors estate.

62.    It is undisputed that Jacobson is untrustworthy.  The court in the Foreclosure Action recognized this and acknowledged his untrustworthiness multiple times.  At the August 2025 Hearing, when discussing how Jacobson violated the June 16, 2025 Order, Judge Murphy stated, "[a]nd there is a very good chance I will appoint a receiver because you betrayed me. You showed me I can't trust you and that is a problem for me.  And I want to make sure these people are all protected as well as the plaintiffs and I have real concerns about that." *See* Ex. 5 (So-Ordered Transcript at p. 44).

63.    As set forth in the January 2026 So-Ordered Transcript, Judge Murphy reiterated his distrust for Jacobson to his counsel due to Jacobson's failure to abide by Judge Murphy's Orders. *See* Ex. 10 (January 2026 So-Ordered Transcript at p. 10) ("I'm very serious, and I told him point blank, I didn't trust him, and it's all on the record, and how I was very seriously turning things over to the District Attorney or U.S. Attorney or both, and also, potentially holding a contempt proceeding.").  This character trait of untrustworthiness does not disappear just because the Debtors have filed for bankruptcy.

64.    Based on the foregoing, the Debtors cannot and should not manage the Mortgaged Property or this chapter 11 case, warranting the appointment of a chapter 11 trustee under section 1104(a)(1) or (a)(2) of the Bankruptcy Code.

35479535.v3

## ALTERNATIVELY, THE CASE SHOULD BE CONVERTED
## TO ONE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

65.     If the Court is not inclined to appoint an operating trustee, cause exists to convert the Debtors' case to chapter 7 under section 1112(b)(1) of the Bankruptcy Code which provides, in part, that "the Court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause…"  11 U.S.C. §1112(b)(1).

66.     As set forth in section 1112(b)(4), the Bankruptcy Code provides sixteen examples of "cause" for conversion or dismissal, but the list is not exhaustive [6]. As such, "courts have also determined that conversion or dismissal of a Chapter 11 case is warranted for other reasons, including the debtor's inability to effectuate a plan . . .." *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); *see In re Van Eck*, 425 B.R. 54, 59 (Bankr. D. Conn. 2010) ("The court

---

[6] The other statutory examples of cause are as follows:

    **(A)** substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
    **(B)** gross mismanagement of the estate;
    **(C)** failure to maintain appropriate insurance that poses a risk to the estate or to the public;
    **(D)** unauthorized use of cash collateral substantially harmful to 1 or more creditors;
    **(E)** failure to comply with an order of the court;
    **(F)** unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
    **(G)** failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
    **(H)** failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
    **(I)** failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;
    **(J)** failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
    **(K)** failure to pay any fees or charges required under chapter 123 of title 28;
    **(L)** revocation of an order of confirmation under section 1144;
    **(M)** inability to effectuate substantial consummation of a confirmed plan;
    **(N)** material default by the debtor with respect to a confirmed plan;
    **(O)** termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and
    **(P)** failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).

35479535.v3

will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." (citation and internal quotation marks omitted)).

67. Here, the same cause that exists to appoint a chapter 11 trustee, as well as other grounds, supports conversion of the Debtors' case to chapter 7 of the Bankruptcy Code. Jacobson has repeatedly violated court Orders, as set forth above. There is no reason to believe that he will not continue to do so during the pendency of this chapter 11 case. The same self-dealing, dishonesty and lack of transparency that supports an operating trustee equally supports conversion.

68. Although section 1112 of the Bankruptcy Code provides that the Court may either dismiss or convert a case, whichever is in the best interest of creditors, Lender submits that here, conversion is warranted. Either a chapter 11 trustee or a chapter 7 trustee can sell the Mortgaged Property and pay the debts due. The Debtors should not be able to continue its obstruction of Carver's rights.

69. For all these reasons, in the event the Court is not inclined to appoint an operating trustee in the Debtors' case, cause exists to convert the Debtors' case to one under chapter 7 of the Bankruptcy Code.

**ALTERNATIVELY, THE AUTOMATIC STAY SHOULD BE VACATED AND THE RECEIVER SHOULD BE EXCUSED FROM COMPLIANCE WITH SECTION 543 OF THE BANKRUPTCY CODE AND SHOULD BE AUTHORIZED TO CONTINUE TO <u>ACT PURSUANT TO THE RECEIVER ORDER</u>**

70. In the event that the Court neither appoints a chapter 11 trustee nor converts the Debtors' case to chapter 7, it is submitted that at a minimum, the automatic stay should be vacated and the Receiver appointed in the Foreclosure Action should be authorized to continue to act pursuant to the Receiver Order, and his compliance with section 543 of the Bankruptcy Code should be excused.

20

71.     Section 362(d)(1) of the Bankruptcy Code permits the Court to terminate modify annul or vacate the automatic stay "for cause," including lack of adequate protection. 11 U.S.C. §362(d)(1). For the same reasons that the Receiver should be excused from compliance in connection with the Mortgaged Property as addressed below, if the Court is not inclined to either appoint a chapter 11 trustee or convert this case to chapter 7, the automatic stay should be vacated to allow the Receiver to carry out his fiduciary duties as set forth in the Receiver Order. Thus, Carver requests in the further alternative that the Court modify the automatic stay to permit the Receiver to continue managing the Mortgaged Property in accordance with the Receiver Order.

72.     Moreover, section 543(d) of the Bankruptcy Code permits a bankruptcy court to excuse a receiver from complying with the requirement of section 543(b) to deliver property under the receiver's control to the debtor. Section 543(b) provides that:

> (b) A custodian shall --
>
> (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
>
> (2) file an accounting of any property of the debtor, or proceeds, product, offspring rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

11 U.SC. § 543(b).

73.     Notwithstanding this provision, section 543(d) further provides that the Court may excuse compliance with subsection (b) of this section if the interests of creditors would be better served by permitting a custodian to continue in possession, custody, or control of such property. 11 U.SC. § 543(d).

35479535.v3

74.    Thus, section 543(d)(1) permits a receiver to remain in possession, custody, or control of property if it serves the interest of creditors. *See, e.g.*, *Dill v. Dime Sav. Bank, FSB (In re Dill)*, 163 B.R. 221, 225 (E.D.N.Y. 1994); *In re Constable Plaza Assoc., L.P.*, 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991); *In re Polar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989).

75.    In determining whether to excuse the turnover requirements of section 543(b), courts often look to the following, non-exhaustive list of factors:

(iii)    the sufficiency of income to fund a successful reorganization;

(iv)    the likelihood the debtor will use the turnover property for the benefit of creditors;

(v)    any mismanagement by the debtor; and

(vi)    the presence or absence of avoidance issues with respect to the property retained by the debtor.

*See Constable Plaza Assoc., L.P.*, 125 B.R. at 103 (internal citations omitted); *In re CCN Realty Corp.*, 19 B.R. 526, 529 (Bankr. S.D.N.Y. 1982) (denying turnover motion where evidence of debtor's mismanagement of operations was present); *see also Dill*, 163 B.R. at 226 (citing cases where receiver excused from turnover requirement based on the prior neglect and/or mismanagement by the debtor).

76.    The sole concern is the interest of creditors and a court may excuse compliance with a turnover order even if all factors resolve in favor of a debtor. *See Polar Springs Apartments*, 103 B.R. at 150 (granting motion to excuse compliance with turnover requirement).

77.    In this case, the foregoing factors warrant excusing compliance under section 543(d). As to the first factor, it is unclear whether the Debtors can fund a successful plan based on its schedules of assets.

22

35479535.v3

78.     As to the second and third factors, Lender has serious concerns that the Debtors will continue to fail to use the Mortgaged Property for the benefit of creditors, including satisfying the debt owed to Lender, in light of the Shareholder's pre-petition misconduct and obstruction. In fact, it was the Jacobson's failure to turnover the Membership Funds of the Mortgaged Property that prompted the court in the Foreclosure Action to order the appointment of a Receiver in the first place and move for Jacobson to be held in contempt, among other things.

79.     Importantly, even if the factors favored the Debtors —which they do not—the creditors' interests mandate that a receiver remain in place. Given Jacobson's previous and continuing behavior, keeping a receiver in place to exercise the duties authorized in the Receiver Order, and excusing his compliance with section 543 is crucial to ensure that monies remain in the estate and available for payment to creditors.

80.     Furthermore, the automatic stay should be vacated because there is little equity remaining in the Mortgaged Property.  The Debtors claim in their bankruptcy petition that the Mortgaged Property has a value of approximately $25,000,000.00.  How the Debtors determined that number is a mystery considering an appraisal conducted by Carver values the Mortgaged Property at approximately $11.9 million, a true and correct copy of which is attached to the Doulin Affidavit as **Exhibit T**.  With the Receiver being unable to perform his duties under the Receiver Order, the little equity that is left in the Mortgaged Property will easily be diminished.

81.      Accordingly, the automatic stay should be vacated so that the Receiver can continue to carry out his duties and responsibilities as set forth in the Receiver Order, and the Receiver should be excused from turning over the Mortgaged Property and any other property in his possession, custody or control and be allowed to continue to perform his duties in accordance with the Receiver Order.

35479535.v3

## CONCLUSION

82.     As it appears that the purpose of these Chapter 11 cases is to allow the Debtors time to market and sell the assets (see Schedule H) as the Debtor has disclosed in its petition a contract of sale.  It is respectfully submitted that either a Chapter 11 or Chapter 7 trustee can achieve this end with out the risk of leaving an untrustworthy Debtor in possession.

83.     For the reasons set forth herein, Lender submits that grounds exist to appoint an operating trustee under section 1104 of the Bankruptcy Code or, alternatively, to convert the Debtors' case to chapter 7 or, alternatively, vacate the automatic stay so that the Receiver may carry out his duties and to excuse compliance of section 543 of the Bankruptcy Code by the Receiver.

84.     No prior request for the relief sought herein has been made to this or any other Court.

WHEREFORE, Lender respectfully requests that the Court grant the relief sought herein, together with such other and further relief as the Court deems just and proper.

Dated:  Uniondale, New York
          February 23, 2026

**CULLEN AND DYKMAN LLP**


By:     */s/ Matthew G. Roseman*
          Matthew G. Roseman, Esq.
          Kelly McNamee, Esq.
333 Earle Ovington Boulevard, 2nd Fl.
Uniondale, New York 11553
Telephone: (516) 357-3700
Email: mroseman@cullenllp.com
          kmcnamee@cullenllp.com

*Attorneys for Carver Federal Savings Bank*


24

35479535.v3