KRISS & FEUERSTEIN LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
(212) 661-2900
Jerold C. Feuerstein, Esq.
Andrew S. Muller, Esq.
Christopher Palmieri, Esq.

*Attorneys for 1751 Ocean LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| NEW YORK BEACH CLUB LTD., | Case No. 26-70576 (LAS) |
| Debtor. | |
| In re: | Chapter 11 |
| OCEAN BLVD., LLC, | Case No. 26-70577 (LAS) |
| Debtor. | |

### MOTION FOR ORDER (A)(I) AUTHORIZING RECEIVER TO CONTINUE IN POSSESSION OF PROPERTY OF THE ESTATES AND EXCUSING RECEIVER FROM TURNOVER COMPLIANCE PURSUANT TO 11 U.S.C. § 543(d), OR, ALTERNATIVELY, (II) APPOINTING CHAPTER 11 TRUSTEE OR, ALTERNATIVELY, (III) CONVERTING DEBTORS' CASES TO CHAPTER 7, AND (B) GRANTING RELATED RELIEF

1751 Ocean LLC ("*Lender*") as and for its Motion for an Order: (A)(I) Authorizing the Receiver to Continue in Possession of Property of the Debtors' Estates, and Excusing the Receiver from Turnover Compliance pursuant to 11 U.S.C. § 543(d), or, alternatively (II) Appointing Chapter 11 Trustee or, alternatively (III) Converting the Debtors' Cases to Chapter 7 and, (B) Granting Related Relief, including entry of a bridge order until the hearing hereon as requested in Paragraph 72 hereof (the "*Motion*"), respectfully sets forth and represents as follows:

## PRELIMINARY STATEMENT

1. The Debtors commenced these Chapter 11 cases on the very date that Alexander V. Jacobson ("*Jacobson*"), the Debtors' principal, was directed to appear before the Honorable Jerome C. Murphy of the Supreme Court of the State of New York, to answer civil and criminal contempt charges arising from his collection of over $900,000.00 in Membership Funds in direct and repeated violation of three separate state court orders.  All of the funds Jacobson and/or the Debtors inappropriately collected remains unaccounted for to Lender.  Judge Murphy threatened to refer Jacobson to both the Nassau County District Attorney and the United States Attorney. Against that backdrop, the only safeguard preventing further dissipation of Lender's cash collateral and the Beach Club's operating revenue has been the Receiver, Michael Sepe, Esq., who, under this Court's prior Orders, has overseen the Debtors' finances since April 10, 2026.

2. The current operational structure of the Debtors' estates resulted from the conduct of the Debtors and Jacobson throughout the Foreclosure Action (defined below) initiated by Carver Federal Savings Bank ("*Carver*").

3. After the commencement of these bankruptcy cases, the selection of successor counsel for the Debtors, and the sale to Lender of Carver's position as lender, the interested parties were able to negotiate a resolution for the Debtors to operate their beach club business for the 2026 summer season by having the Receiver continue in control of the Debtors' finances.  As explained in further detail below, numerous orders and in-court directives were made in the Foreclosure Action which the Debtors and Jacobson willingly violated without any regard for same.  The threat of incarceration did not deter Jacobson, and the Foreclosure Action proceeded to the point that hearings on Jacobson's civil and criminal contempt were scheduled.  On the very day the contempt hearings were to be held, Jacobson caused the Debtors to commence these bankruptcy cases in an attempt to avoid the consequences of his actions.  *See Affirmation of Alexander Jacobson and*

2

*Affirmation and Memorandum of Law in Support of Defendant's Order to Show Cause* (the "*Affirmation*") attached as **Exhibit "1"** to the Feuerstein Declaration ("The fact that the threat of incarceration is incrementally short of immediate should be of no moment."). Lender acquired the Loans from Carver after years of pre-petition Debtor misconduct, and after the commencement of these bankruptcy cases. Lender thereafter consented to the use of its cash collateral and supported operations of the Beach Club through the 2026 summer season for the benefit of all constituencies, including the Beach Club Members.

4.      This pattern of noncompliance with court orders exhibited by Jacobson throughout the Foreclosure Action necessitated the agreement that was reached with Lender to have the Debtors operate with the Receiver in place. The Debtors have now indicated they want to revisit the issue of continuing the Receiver in place now that the Beach Club is open for the 2026 summer season. Lender brings the instant Motion so the matter is properly before the Court and so that it may protect its interest in the Beach Club business, the Mortgaged Property, and its collateral. The pre-petition conduct of Jacobson has been erratic and contemptuous, and the Beach Club was able to open for the 2026 summer season *only* because the Receiver provided disciplined oversight of Jacobson's actions.

5.      Notably, NYBC's own member-creditors — including Joel Robinson, Marc Altheim, and Felicia Solomon — filed position statements early in these cases supporting the continuation of the Receiver, recognizing that the Receiver's oversight is essential to ensure that the Beach Club continues to operate and Membership Funds are appropriately accounted for.

6.      Based on the foregoing record, Lender submits that the Receiver must continue in these cases until confirmation or conversion of the Debtors' cases.

3

7. Therefore, it is respectfully requested that the Court grant the relief requested herein, including the bridge order.

<div align="center">**JURISDICTION, VENUE AND STATUTORY AUTHORITY**</div>

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (E). Venue in this district is proper pursuant to 28 U.S.C. § 1408.

<div align="center">**BASIC BACKGROUND**</div>

9. On February 10, 2026 (the "*Petition Date*"), New York Beach Club Ltd. ("*NYBC*") and Ocean Blvd., LLC ("*Ocean*", and together with NYBC, the "*Debtors*") each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, (the "*Bankruptcy Code*") with the United States Bankruptcy Court for the Eastern District of New York (the "*Court*").

10. Jacobson is the manager of NYBC and the president of Ocean.

11. Lender, as the assignee of Carver, holds two commercial mortgages (as described more fully below) and blanket liens encumbering the real and personal property situated in Atlantic Beach, Town of Hempstead, County of Nassau and State of New York, designated as Section: 58, Block: 32 and Lots: 1-20, 21-25 and 26-30 and Section: 58, Block: E, Lots: 131 and 132 on the Tax Map of Nassau County, New York, known as and by the street address, 1751 Ocean Boulevard, Atlantic Beach, New York 11509 (the "*Property*" or the "*Mortgaged Property*").

12. NYBC is the holder of a leasehold interest in the Mortgaged Property (the "*Leasehold Estate*") pursuant to an unrecorded operating lease between NYBC as tenant and Ocean as landlord (the "*Operating Lease*").

13. Ocean is the owner and holder of a fee interest in the Mortgaged Property (the "*Fee Estate*").

<div align="center">4</div>

14.     Each of the Mortgages (as defined below) encumbers both the Leasehold Estate and Fee Estate.

15.     The Mortgaged Property is a beach club (the "*Beach Club*") which, upon information and belief, has hundreds of members ("*Beach Club Members*").  The Beach Club Members pay yearly membership fees each season ("*Membership Funds*") for the privilege of using the Beach Club facilities and amenities for the summer season beginning from Memorial Day weekend through to Labor Day weekend.

16.     No trustee, examiner or creditors' committee has been appointed in either of the Debtors' cases.  As set forth in more detail below, the Receiver remains in possession and control of each of the Debtors' finances.

## THE LOAN DOCUMENTS

### Loan A

17.     On or about March 31, 2022, Carver made a loan to the Debtors in the original principal amount of Seven Million Two Hundred Seventy-Five Thousand and 00/100 Dollars ($7,275,000.00) ("*Loan A*").[1]

18.     To evidence its indebtedness under Loan A, on or about March 31, 2022, the Debtors, for value received, executed, acknowledged and delivered to Carver, a *Consolidated, Amended and Restated Promissory Note* (the "*Loan A Note*"), in the original principal amount of Seven Million Two Hundred Seventy-Five Thousand and 00/100 Dollars ($7,275,000.00) with interest thereon at the rates therein provided, and promised to pay said amount plus interest thereon to Carver.  A true and correct copy of the Loan A Note is attached to the Blisko Affidavit as **Exhibit "A"**.

---

[1] The facts herein are as attested to in the Affidavit of Joshua Blisko (the "*Blisko Affidavit*") and the Declaration of Jerold C. Feuerstein, Esq. (the "*Feuerstein Declaration*"), submitted simultaneously with the Motion.

5

19.    To secure payment of the Loan A Note, on or about March 31, 2022, the Debtors, for value received, executed, acknowledged and delivered to Carver, a *Consolidation, Spreader, Extension and Modification Agreement* (the "*Loan A Mortgage*"), in the original principal amount of Seven Million Two Hundred Seventy-Five Thousand and 00/100 Dollars ($7,275,000.00), securing a first mortgage lien on the Mortgaged Property.  The Loan A Mortgage was recorded on October 27, 2022, in the Nassau County Clerk's Office in Liber 46920 at page 304 *et seq.* and was duly indexed according to law and the tax, if any, imposed by law upon the recording thereof was duly paid.  A true and correct copy of the Loan A Mortgage is attached to the Blisko Affidavit as **Exhibit "C"**.

20.    As additional security for the payment of Loan A from the Debtors, Jacobson, for value received, executed, acknowledged and delivered to Carver, a *Guaranty Agreement* dated as of March 31, 2022, wherein, Jacobson guaranteed all obligations, indebtedness and other liabilities of the Debtors (the "*Loan A Guaranty*").  A true and correct copy of the Loan A Guaranty is attached to the Blisko Affidavit as **Exhibit "K"**.

21.    The Loan A Note, Loan A Mortgage, and Loan A Guaranty, together with all other loan documents relating to Loan A as set forth in further detail in the Blisko Affidavit are referred to collectively herein as the "*Loan A Documents*".

**Loan B**

22.    On or about March 31, 2022, Carver made another loan to the Debtors in the original principal amount of Nine Hundred Twenty-Five Thousand and 00/100 Dollars ($925,000.00) ("*Loan B*", and collectively with Loan A, the "*Loans*").

23.    To evidence its indebtedness under Loan B, on or about March 31, 2022, the Debtors, for value received, executed, acknowledged and delivered to Carver, a Promissory Note ("*Loan B Note*", and together with the Loan A Note, the "*Notes*"), in the original principal amount

6

of Nine Hundred Twenty-Five Thousand and 00/100 Dollars ($925,000.00) with interest thereon at the rates therein provided, and promised to pay said amount plus interest thereon to Carver.  A true and correct copy of the Loan B Note is attached to the Blisko Affidavit as **Exhibit "L"**.

24.     To secure payment of the Loan B Note, on or about March 31, 2022, the Debtors for value received, executed, acknowledged and delivered to Carver, a Mortgage, Assignment of Leases and Rents and Security Agreement (the "*Loan B Mortgage*", and together with the Loan A Mortgage, the "*Mortgages*"), in the original principal amount of Nine Hundred Twenty-Five Thousand and 00/100 Dollars ($925,000.00), securing a mortgage lien against the Mortgaged Property.  The Loan B Mortgage was recorded on October 31, 2022, in the Nassau County Clerk's Office in Liber 46925 at page 940 *et seq.* and was duly indexed according to law and tax, if any, imposed by law upon recording thereof was duly paid.  A true and correct copy of the Loan B Mortgage is attached to the Blisko Affidavit as **Exhibit "M"**.

25.     Pursuant to the Loan B Mortgage, the Debtors granted a security interest in the Collateral (as defined in the Loan B Mortgage).

26.     As additional security for the payment of Loan B from the Debtors, Jacobson for value received, executed, acknowledged and delivered to Carver, a *Guaranty Agreement*, dated as of March 31, 2022, wherein Jacobson guaranteed all obligations, indebtedness and other liabilities of the Debtors (the "*Loan B Guaranty*", and together with the Loan A Guaranty, the "*Guaranties*"). A true and correct copy of the Loan B Guaranty is attached to the Blisko Affidavit as **Exhibit "S"**.

27.     The Loan B Note, Loan B Mortgage, and Loan B Guaranty, together with all other loan documents relating to Loan B as set forth in further detail in the Blisko Affidavit are referred to collectively herein as the "*Loan B Documents*" (collectively, with the Loan A Documents, the "*Loan Documents*").

7

**The Defaults**

28.    The Debtors and Jacobson failed to comply with the terms of Loan A Note and Loan A Mortgage by failing to make the monthly payments required thereby, of principal, interest and escrow, which became due on September 1, 2023 and on the first day of each month thereafter (the "*Loan A Payment Default*").

29.    The Debtors and Jacobson failed to comply with the terms and provisions of the Loan B Note and Loan B Mortgage by failing to make the monthly payments required thereby, of principal, interest and escrow, which came due on December 1, 2023 and on the first day of each month thereafter (the "*Loan B Payment Default*", and together with the Loan A Payment Default, the "*Payment Defaults*").

30.    Moreover, the Debtors defaulted under the Loan Documents upon execution, which did not come to light until their bankruptcy cases were filed.  At the time the Loan Documents were executed, both of the Debtors were guarantors of another entity's debt in violation of the Loan Documents, which constituted an Event of Default under the Loan Documents.  The Debtors' obligations as guarantors were previously unknown to Carver and Lender.

31.    Specifically, both Debtors' Schedules of Liabilities list Newtek Small Business Finance LLC ("*Newtek*") as holding an unsecured claim in the amount of $5,000,000.00 based upon a guarantee.  A search of publicly filed documents in the New York State Courts Electronic Filing System revealed a foreclosure action commenced by Newtek, in which both Ocean and NYBC are named as defendants, as guarantors pursuant to U.S Small Business Administration Unconditional Guarantees dated June 30, 2021, executed in favor of Newtek (the "*Newtek Guarantees*").  Newtek has filed a proof of claim against each of the Debtor's estates [NYBC Claim No. 121] [Ocean Claim No. 3].  Copies of the Newtek Guarantees are annexed to the Blisko Affidavit as **Exhibit "T"**.  Ocean and NYBC's guaranty of the debt of another entity violates

8

multiple provisions of the Loan Documents, including, but not limited to, the following: (i) Section 1.21(i) of the Mortgages; (ii) Section 1.21(xv) of the Mortgages; (iii) a "Closing Certificate" executed by Ocean and NYBC in connection with the origination of the Loans; and (iv) Section 6 of the Notes.

32.     Ocean and NYBC's breach of each of the above referenced provisions constitutes an "Event of Default" pursuant to Section 5.1 of the Mortgages (the "*Covenant Defaults*", and together with the Payment Defaults, the "*Defaults*").

33.     It is unknown whether Carver would even have made the Loans to the Debtors but for the misrepresentations made by each of the Debtors by way of the Covenant Defaults.

## THE FORECLOSURE ACTION

34.     On March 26, 2024, based on the Debtors' Payment Defaults under the Loan Documents, Carver commenced an action to foreclose the Mortgages by filing a Summons, Verified Complaint, and Notice of Pendency (the "*Complaint*") in the Office of the Clerk of the County of Nassau, under Index No. 605303/2024 (the "*Foreclosure Action*").

35.     By order dated December 23, 2024 and entered December 26, 2024, the court in the Foreclosure Action entered a Short Form Order (the "*Short Form Order*"), denying Carver's Summary Judgment Motion and granting Debtors' Cross-Motion.[2]  A true and correct copy of the Short Form Order is attached to the Feuerstein Declaration as **Exhibit "2"**.

36.     According to the Short Form Order, the Honorable Jerome C. Murphy explained that there were questions of fact on whether defendants were actually behind on their payments.

---

[2] By motion dated July 30, 2024 (the "*Summary Judgment Motion*"), Carver sought, *inter alia*, entry of an order granting summary judgment on its Complaint.  In response, the Debtors and Jacobson filed Notice of Cross-Motion and Memorandum in Opposition to Motion and in Support of Cross-Motion, seeking entry of an order allowing Debtors to file a Second Amended Verified Answer and denial of Carver's Summary Judgment Motion

9

Additionally, Judge Murphy explained that the members of the Beach Club should be named as parties because they:

> start pre-paying for their cabanas and lockers months before the club opens in May of each year.  However, none of these individuals are named as parties and none have been served.  The motion papers indicate that there may be 1200 member/renters.  Clearly, they have rental agreements and an interest in this proceeding, including what will happen to their rents.  Thus, they are necessary parties to this proceeding, who should have been given a say in this motion. . . .*See* Ex. 2 (Short Form Order).

37.    By motion dated January 24, 2025 (the "*Reargue Motion*"), Carver sought entry of an order for leave to reargue the Short Form Order, which denied Carver's Summary Judgment Motion.

38.    By order dated June 11, 2025 and entered June 16, 2025 (the "*June 16, 2025 Order*"), the court in the Foreclosure Action granted Carver's Reargue Motion.  A true and correct copy of the June 16, 2025 Order is attached to the Feuerstein Declaration as **Exhibit "3"**.

39.    According to the June 16, 2025 Order, Judge Murphy found that the Debtors and Jacobson did default under the Loan Documents and explained that "[t]he Court should not have found on liability grounds that these 3 defendants were not obligated to the plaintiff on these accelerated debts." *See* Ex. 3 (June 16, 2025 Order).  However, Judge Murphy would not enter judgment on the unnamed members since the tenancy term did not end until September of 2025.

40.    Additionally, pursuant to the June 16, 2025 Order, Judge Murphy further ordered that "[i]n the interim, it is ORDERED that the parties and their agents are not to enter into any further rentals for the 2026 season without permission of the Court." *See* Ex. 3 (June 16, 2025 Order).

41.    As set forth in the Feuerstein Declaration, the Debtors never made an application for permission to sell memberships, and in fact, did sell memberships and collected in excess of $900,000.00 in Membership Funds.  This was a direct violation of several court orders.  Upon

10

discovering the Debtors' contemptuous conduct, counsel for Carver advised the court by letter dated July 22, 2025, which is annexed as **Exhibit "4"** to the Feuerstein Declaration.  In response to counsel's letter, the Court scheduled a hearing and directed Jacobson to appear.

42.     On August 27, 2025, a hearing (the "*August 2025 Hearing*") was held regarding the conduct of the defendants.  At the August 2025 Hearing, Jacobson testified under oath.  The transcript from the August 2025 Hearing was so-ordered, therefore rendering any directions from Judge Murphy an order of the court (the "*So-Ordered Transcript*").  A true and correct copy of the So-Ordered Transcript is attached to the Feuerstein Declaration as **Exhibit "5"**.

43.     At the August 2025 Hearing, Judge Murphy questioned Jacobson if he had been collecting Membership Funds in violation of the June 16, 2025 Order, to which Jacobson admitted that he had. *See* Ex. 5 (So-Ordered Transcript at pp. 16-33).  Judge Murphy ordered Jacobson again, "[Y]ou are not to take anymore deposits; and if you get a deposit, you return it.  You weren't allowed to take deposits since June and you've been violating my order.  Every time you violate my order is another violation." *See* Ex. 5 (So-Ordered Transcript at pp. 43-44).

44.     By Decision & Order dated October 28, 2025 and entered October 29, 2025 and the *Order Granting Summary Judgment, Default Judgment, Order of Reference and Amendment of Caption* dated October 28, 2025 (together, the "*Order of Reference*"), the court granted the Renewal Motion, found the Debtors and Jacobson liable, and appointed a referee to compute the amounts due under the Notes and Mortgages.[3]  A true and correct copy of the Order of Reference is attached to the Feuerstein Declaration as **Exhibit "6"**.

---

[3] By motion dated December 24, 2025, Carver filed a Notice of Motion and Motion for Confirmation of Referee's Report & Judgment of Foreclosure & Sale (the "*Foreclosure Sale Motion*").  By the Foreclosure Sale Motion, Carver sought, *inter alia*, confirmation of the Referee's Oath and Report of the amount due to Carver by the Debtors.  A true and correct copy of the Referee Oath and Report is attached to the Feuerstein Declaration as **Exhibit "8"**.  As of the date of the bankruptcy filing, the Foreclosure Sale Motion was fully submitted.

11

45.     Additionally, pursuant to the Order of Reference, the Debtors and Jacobson were further ordered not to issue any new memberships, reiterating the June 16, 2025 Order. *See* Ex. 6 (Order of Reference).

46.     In light of the Debtors' continued violation of Judge Murphy's orders, Carver moved for the appointment of a receiver. On January 15, 2026, the court entered an *Order Appointing a Temporary Receiver*, whereby the court named Michael Sepe as receiver (the "*Receiver*") of the Mortgaged Property (the "*Receiver Order*")[4]. A true and correct copy of the Receiver Order is attached to the Feuerstein Declaration as **Exhibit "7"**.

47.     According to the Receiver Order, the Receiver was appointed "with the usual powers and directions as the Temporary Receiver for the benefit of [Carver] of all rents and profits now due and to become due (including deposits and payments towards the 2026 rents) during the pendency of this action. . . ." *See* Ex. 7 (Receiver Order).

48.     Due to the Debtors' and Jacobson's continuing failure to comply with the court's Orders, the Receiver filed an *Order to Show Cause* seeking to hold the Debtors and Jacobson in civil and/or criminal contempt of the court's prior Orders. The court entered the Order to Show Cause on February 4, 2026 and scheduled a hearing for February 10, 2026, to consider holding the defendants in the Foreclosure Action in contempt. In a transparent attempt to evade the scheduled contempt proceedings and their consequences, the Debtors filed Chapter 11 on that very date—February 10, 2026—the day that Jacobson was directed to appear before Judge Murphy in response to the Receiver's application to hold the defendants in contempt. A copy of the Receiver's motion is attached to the Feuerstein Declaration as **Exhibit "9"**.

---

[4] The June 16, 2025 Order, So-Ordered Transcripts, Order of Reference and the Receiver Order are collectively, the "*Orders*".

12

49.    Additionally, the Debtors spent a significant portion of the Membership Funds.  As set forth in the court transcript of January 9, 2026 (the "*January 2026 So-Ordered Transcript*" and together with the So-Ordered Transcript, the "*So-Ordered Transcripts*"), annexed to the Feuerstein Declaration as **Exhibit "10"**, Debtors' counsel advised the court that the Debtors collected over $900,000.00 from over 600 individuals.  *See* Ex. 10 (January 2026 So-Ordered Transcript at p. 15).   However, NYBC identifies only $752,000.00 in its Bankruptcy Petition and Schedules [NYBC ECF No. 1].   Of this amount, Carver transferred approximately $576,000.00 to the Receiver, pursuant to his lawful demand, and NYBC scheduled $184,134.16 in two Chase accounts, totaling $760,134.16.   Accordingly, approximately $140,000.00 of the collected Membership Funds remains unaccounted for.

50.    It is apparent that the Debtors have spent the money, and to avoid accounting for the funds collected and expended in direct contravention of the court Orders, the Debtors sought refuge in this Court.

51.    The timing and circumstances of the Debtors' bankruptcy filing strongly suggest that the cases were filed in bad faith.  The Debtors filed their Chapter 11 petitions on the exact date—February 10, 2026—that Jacobson was scheduled to appear before Judge Murphy for a contempt hearing.  This Court has recognized that a bankruptcy filing made primarily to frustrate state court proceedings, rather than for legitimate reorganization purposes, constitutes bad faith warranting conversion or dismissal.  *See In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310-11 (2d Cir. 1997) (listing factors for determining bad faith filing).  The Debtors' pre-petition dissipation of Membership Funds, repeated violations of court orders, and filing on the eve of contempt proceedings all support the conclusion that these cases were filed to abuse the protections of the Bankruptcy Code rather than to pursue a good faith reorganization.

13

## THE BANKRUPTCY CASES

52.    At the outset of the bankruptcy cases, the Debtors sought to continue in possession of their property and the management of their affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Immediately after the commencement of the Debtors' bankruptcy cases, NYBC filed on February 12, 2026, an Emergency Motion to Use Cash Collateral [NYBC ECF No. 11] (the "*Cash Collateral Motion*").

53.    NYBC also filed on February 13, 2026, a Motion to Compel Michael Sepe, Receiver, to account and turnover property of the estate pursuant to 11 U.S.C. § 543 [NYBC ECF No. 17] (the "*Receiver Turnover Motion*").

54.    On February 23, 2026, Carver filed Motion for an Order (A)(I) Appointing Chapter 11 Trustee or, Alternatively, (II) Converting Debtors Case or, Alternatively, (III) Vacating the Automatic Stay and Excusing the Receivers Compliance with 11 U.S.C. § 543 [NYBC ECF No. 27, 28] [Ocean ECF No 15, 16] (the "*Trustee/Conversion/Excuse Receiver Compliance Motion*").

55.    Carver also filed on February 24, 2026 an Objection to the Cash Collateral Motion [NYBC ECF No. 30] and an Objection to the Receiver Turnover Motion [NYBC ECF No. 29].

56.    On February 25, 2026, the Receiver also filed a Declaration in opposition to the Cash Collateral Motion, in opposition to the Receiver Turnover Motion, and in support of the Trustee/Conversion/Excuse Receiver Compliance Motion [NYBC ECF No. 33], in which he set forth all the instances in which the Debtors and Jacobson were ordered multiple times not to collect advance deposits or full payments for the 2026 summer season and how and when the Debtors and Jacobson defied those order and further defied all the orders and directives to account for the amounts, locations and expenditures of those funds, as well as outlining the contempt of those orders as evidenced by not only the collection of those funds but also the concealing of the Debtors' actions as to same, and the location of such funds.

14

57. On February 25, 2026, Limited Objections to the Cash Collateral Motion and the Receiver Turnover Motion were also filed by NYBC members Joel Robinson and Marc Altheim [NYBC ECF No. 35], and Felicia Solomon [NYBC ECF No. 36, 37].

58. At the initial hearing on the Cash Collateral Motion on February 26, 2026, the Receiver Turnover Motion, and the Trustee/Conversion/Excuse Receiver Compliance Motion, the Court directed the parties to submit a proposed stipulation to be "so ordered" to keep the Receiver in place for 30 days, and scheduled another hearing on all matters for March 26, 2026.

59. On March 5, 2026, Carver assigned all of its right, title, and interest as lender under Loan A and Loan B to Lender.

60. On March 3, 2026, counsel for the Debtors abruptly filed a Motion to Withdraw as Counsel for the Debtors [NYBC ECF No. 43] [Ocean ECF No. 20].

61. On or about March 19, 2026, the Debtors filed a Motion to Substitute new counsel to replace their original counsel who sought to withdraw from representing them [NYBC ECF No. 55] [Ocean ECF No. 30].

62. Also on March 19, 2026, the Debtors filed their Opposition to the Trustee/Conversion/Excuse Receiver Compliance Motion originally filed by Carver [NYBC ECF No. 57] [Ocean ECF No. 32], in which the Debtors proposed the concept of a resolution, stating "the Debtors also believe excusing the Receiver from certain of his obligations under § 543(a), (b) and (c) on a temporary basis would be a prudent way to proceed so this case can move forward expeditiously". The Debtors proposed allowing the Receiver to remain in control of the Debtors' finances at least until the Beach Club opens, with the issue of the continuation of the Receiver being revisited by the Court and the interested parties past that point in time. *See* Opposition, ¶ 12.

15

63. On March 23, 2026, the Court approved a Stipulation by and between the Debtors and the Receiver for turnover of funds by the Debtors to the Receiver [NYBC ECF No. 61] [Ocean ECF No. 36].

64. On March 24 and March 25, 2026, NYBC members Joel Robinson and Marc Altheim [NYBC ECF No. 69], and Felicia Solomon [NYBC ECF No. 70] filed Limited Position Statements supporting the concept of allowing the Receiver to remain in place and in control of the Debtors' finances because it would allow for the reopening of the Beach Club for the 2026 season while providing oversight by the Receiver who will review the Debtors' records and control the use of funds during the reopening phase of the Beach Club.

65. During the period of time from when Lender became the holder of all right, title and interest as lender under the Loan Documents to the March 26, 2026 Hearing on the Receiver Turnover Motion and the Trustee/Conversion/Excuse Receiver Compliance Motion, Lender, through its counsel, was negotiating with the Debtors, through their new counsel, as to the terms of the continuation of the Receiver and the progress of the Debtors' cases going forward. It was glaringly apparent that Jacobson wanted the Beach Club to open because, notwithstanding the numerous directives and court orders to the contrary, he collected 2026 Membership dues.

66. At the March 26, 2026 Hearing on the Receiver Turnover Motion and the Trustee/Conversion/Excuse Receiver Compliance Motion, Lender and the Debtors indicated their consent to allowing the Receiver to remain in place in order to have the Beach Club open, which was supported by the NYBC members who filed position statements and/or simply appeared at the March 26, 2026 Hearing. Equally important was the Receiver's positive indications of a willingness to remain in that role, and his ability to perform the functions described by the parties. The purpose of maintaining the Receiver was to preserve the going concern value of Lender's

16

collateral, including both the Property and the Beach Club business, as well as to have a third party with authority to review past, and monitor current, financial activities of the Debtors.

67.    By Order dated April 10, 2026, an *Order Excusing Receiver From Turnover Compliance Pursuant to 11 U.S.C. § 543(d), Authorizing Receiver to Continue in Possession of Property of the Estate, and Granting Related Relief* (the "*Receiver Continuation Order*") [NYBC ECF No. 81] [Ocean ECF No. 51] was entered.  A copy of the Receiver Continuation Order is annexed to the Feuerstein Declaration as **Exhibit "11"**.

68.    In furtherance thereof, on April 13, 2026, a *Stipulation and Interim Order by and between Proposed Counsel to the Debtor, Receiver and Attorneys for 1751 Ocean LLC Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) and Granting Adequate Protection Pursuant to 11 U.S.C. § 361* (the "*Stipulation and Interim Cash Collateral Order*") [NYBC ECF No. 86] [Ocean ECF No. 52] was also entered by the Court.  A copy of the Stipulation and Interim Cash Collateral Order is annexed to the Feuerstein Declaration as **Exhibit "12"**.

69.    At the next scheduled hearing on the Case Status Conference on April 30, 2026, the Debtors, the Lender, and the Receiver provided a report to the Court concerning the progress of the opening of the Beach Club, and discussed the efforts and details of how operations would continue for the 2026 summer season.

70.    On May 22, 2026, the Court entered a *Consent Order Extending Existing Order Excusing Receiver from Turnover Compliance Pursuant to 11 U.S.C. Section 543(d), Authorizing Receiver to Continue in Possession of Property of the Estate, and Granting Related Relief* (the "*Consent Order Continuing Receiver*") [NYBC ECF No. 100] [Ocean ECF No. 66], providing for the Receiver to remain in place through to June 9, 2026, the date of the next Case Status Conference before the Court and, on the record, authorized the continued use of cash collateral consistent with

17

the previously entered Stipulation and Interim Cash Collateral Order. A copy of the Consent Order Continuing Receiver is annexed to the Feuerstein Declaration as **Exhibit "13"**.

71. On March 27, 2026, Lender filed its proofs of claim against both Debtors' estates indicating that, as of the Petition Date, it is owed a total of \$11,945,911.80, consisting of \$10,789,901.59 owed on account of Loan A, plus \$1,156,010.20 owed on account of Loan B [NYBC Claim No. 112] [Ocean Claim No. 2] (the "*Proof of Claim*"). A copy of Lender's Proof of Claim is annexed to the Blisko Affidavit as **Exhibit "U"**.

## RELIEF REQUESTED

72. This Motion is filed in advance of the June 9, 2026 potential expiration of the existing Consent Order Continuing Receiver [NYBC ECF No. 100] [Ocean ECF No. 66], and Lender respectfully requests that the relief sought herein take effect upon expiration of that Order to ensure continuity of the Receiver's oversight. In this regard, the hearing on this Motion is currently scheduled for July 9, 2026, which was the earliest available hearing date in order to provide sufficient notice of the Motion. At the hearing scheduled for June 9, 2026, the issue of the continuation of the Receiver will likely be discussed to a certain degree. Regardless, in the event the June 9, 2026 hearing does not take place, and/or is continued or adjourned, Lender requests that the Court enter a bridge order providing for the continuity of the Receiver until resolution of the instant Motion. A proposed bridge order is annexed to the Feuerstein Declaration as **Exhibit "14"**.

73. Lender seeks to continue to maintain the current *status quo* of the Debtors' cases, with the Receiver to remain in place and in control of the Debtors' finances, and all other operational decisions to continue to be made by the Debtors' principal, Jacobson, with the input and observation of a hospitality industry consultant selected by Lender ("*Lender's Hospitality Advisor*") to provide independent operational expertise during the 2026 summer season, and the

18

Receiver remaining as the "tiebreaker" in the event of a lack of consensus between Jacobson and Lender's Hospitality Advisor.

74.    Lender submits the rubric the Debtors are currently operating under, with the Receiver, and input of Lender and/or its advisor, was a solution that all interested parties, including prospective members, consented to, if not actively supported.  As subsequent events have demonstrated, NYBC was able to timely and fully open the Beach Club to its members for the 2026 summer season, and all necessary post-petition expenses were substantiated and paid, while Debtors acted under the Receiver's oversight.

75.    However, despite being in Chapter 11 for nearly four months, the Debtors have not filed any plan of reorganization, disclosure statement, or even a term sheet outlining their proposed treatment of Lender's secured claims.  The Debtors recently sought a 90-day extension of their exclusive period to file a plan [NYBC ECF No. 92] [Ocean ECF No. 58], to which Lender filed a separate Objection [NYBC ECF No. 101] [Ocean ECF No. 67].

76.    However, Lender's agreement with this procedure in order to accomplish the opening of the Beach Club does not excuse the Debtors' and/or Jacobson's conduct and actions prior to the commencement of these bankruptcy cases.  The Court should be reminded that throughout the Foreclosure Action, Jacobson repeatedly and blatantly violated the court's Orders. He solicited Membership Funds and collected money deposits from Beach Club Members despite several verbal and written Orders of the court not to.  It also appears that the Debtors further violated Judge Murphy's orders by spending a portion of the Membership Funds they were directed to hold.  *See* Ex. 5 (So-Ordered Transcript at pp. 43-44).  Lender is still waiting for an accounting report from the Receiver on that issue.

19

77.     It is evident that Jacobson's past violations of state court orders, and his interference with the Receiver's duties during the Foreclosure Action, obstructed the resolution of many of the issues which plagued the Mortgaged Property and jeopardized, what was then Carver's and is now Lender's, interest therein.   Unfortunately for the Debtors and Jacobson, historical activity is a strong indicator of future performance, and prior to the appointment of the Receiver in these Chapter 11 cases, Jacobson's pattern of conduct suggested that he would continue to so act and interfere with the Mortgaged Property, harming Lender's and other creditors' interests in the Mortgaged Property and in the instant chapter 11 cases.

78.     During the period of preparation for the re-opening of the Beach Club, many of those issues were avoided, and Lender is firmly convinced and respectfully submits that it was *precisely* because of the presence of the Receiver and the input of Lender, that the successful result of the timely opening of the Beach Club was accomplished.

79.     The original purpose and intent of continuing the presence of the Receiver was to preserve and protect the funds representing the partial deposits, and payments in full, of membership dues by members who remitted such funds with the intent and expectation to appear at, and use the amenities and services of, NYBC for the 2026 season.

80.     Since the bankruptcy filing, with the consent of Lender, those funds have been used by NYBC to pay expenses necessary to reach the temporary milestone of opening for the 2026 summer season because such action was beneficial to (a) the prospective members, in that they would receive what they bargained for; an operating beach club commensurate with prior practice, custom, and amenities and services; and (b) the creditors of both NYBC and Ocean Blvd., including, in particular, Lender which holds two mortgages and blanket liens on all real and personal property of both Ocean and NYBC.

81.     In order to achieve this milestone, and because of the blatant disregard by Jacobson, in his individual capacity and as manager of Ocean and President of NYBC, for the various state court orders, directives in court by Nassau Supreme Court Justice Jerome C. Murphy, and the demands of the Receiver, which were unquestionably indicative of his lack of trustworthiness, Lender required that the Receiver remain in place and remain in control of the finances of NYBC and Ocean while they were allowed to operate in Chapter 11 (by preparing to open).

82.     That underlying basis for the Receiver remaining in place and in control of the finances remains the same, even though, now that the Beach Club is open and members are able to enjoy the benefits of the membership dues they paid, that will only be true if the Beach Club remains open for the *entire* summer season.

83.     More importantly, that remains true for Lender which, up until now, has consented to the use of its cash collateral, with the expectation that once the summer season begins, the operation of NYBC will be a profitable endeavor.  In this regard, Lender is owed $11,945,911.80 as indicated in its proofs of claim.  The expenditures Lender has allowed leading up to Memorial Day weekend and beyond were done so with the expectation that operations would result in a positive return on its investment.  This can only be accomplished if the Receiver remains in place during the entire summer season to oversee the finances of Debtors.  Lender expects that there will be significant sums earned by NYBC from food and beverage, including alcoholic beverage, sales, a portion of which may be accomplished by cash transactions.

84.     This need for continued oversight is illustrated by Jacobson's post-petition conduct. During the preparatory period for reopening, on an almost daily basis, Jacobson would request that certain checks be issued and payments made by the Receiver without providing suitable and sufficient back-up for such expenses.  On a number of occasions, the requested payments were for

21

pre-petition outstanding amounts—notwithstanding the existence of the automatic stay and the distribution requirements for pre-petition claims under the Bankruptcy Code.[5]

85.    Jacobson has also sought to pay an affiliate insider entity (Boardwalk Empire, LLC, believed to be solely owned by Jacobson) almost $100,000 to use its premises for parking.  This is notwithstanding the fact that there has never been a written agreement for such use according to Jacobson.  Moreover, despite repeated request, Debtors have not provided any evidence of their past payments to Boardwalk Empire for use of this lot.  More troubling is that the Boardwalk Empire property is also the subject of a foreclosure action commenced by its lender.  The Referee therein is currently finalizing his report of the amounts due, meaning that entry of a judgment of foreclosure and sale for the Boardwalk Empire property is not far off.  The Debtors have not addressed with Lender the solution of where to park members' cars if/when the Boardwalk Empire property is sold in a foreclosure sale.

86.    Adding to Lender's determination to have the Receiver remain in place is that without any notice to the Receiver or Lender, Jacobson on behalf of NYBC entered into a reciprocity agreement with another social club located in Manhattan, whereby members from each club could use the other club's facilities on a limited basis.  There was no disclosure about whether any monetary consideration was exchanged or whether any additional liability was incurred by NYBC as a result of this agreement.

87.    This demonstrates that even with the Receiver in place, Jacobson has attempted to circumvent proper bankruptcy procedures, underscoring the ongoing need for independent financial oversight.

---

[5] Debtors' counsel has repeatedly advised Jacobson that pre-petition claims cannot be paid at this time by the Receiver. Notwithstanding this advice, Jacobson continued to present such payment requests.

22

## THE AUTOMATIC STAY SHOULD CONTINUE TO BE MODIFIED AND THE RECEIVER SHOULD CONTINUE TO BE EXCUSED FROM COMPLIANCE WITH BANKRUPTCY CODE § 543 AND CONTINUE TO ACT PURSUANT TO THE RECEIVER CONTINUATION ORDER

88.     By this motion, the automatic stay should continue to be modified and the Receiver appointed in the Foreclosure Action should continue to be authorized to act pursuant to the Receiver Continuation Order, and his compliance with section 543 of the Bankruptcy Code should be excused.

89.     Section 362(d)(1) of the Bankruptcy Code permits the Court to terminate, modify, annul or vacate the automatic stay "for cause," including lack of adequate protection. 11 U.S.C. § 362(d)(1).  Here, cause exists to continue the stay modification because without the Receiver's ongoing oversight, Lender's collateral—including the Membership Funds, the Beach Club's operating revenue, and the Mortgaged Property itself—remains at substantial risk of dissipation given Jacobson's demonstrated pattern of disregarding court orders and misappropriating funds. The Receiver's continued possession of estate property and control over the Debtors' finances constitutes adequate protection for Lender's secured claim by ensuring that estate assets are preserved and properly accounted for.  Thus, Lender requests that the Court continue to modify the automatic stay to permit the Receiver to continue managing the operational finances of the Debtors in accordance with the Receiver Continuation Order.

90.     Moreover, section 543(d) of the Bankruptcy Code permits a bankruptcy court to excuse a receiver from complying with the requirement of section 543(b) to deliver property under the receiver's control to a debtor.  Section 543(b) provides that:

> (b) A custodian shall --
>
> (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the

23

> date that such custodian acquires knowledge of the commencement of the case; and
>
> (2) file an accounting of any property of the debtor, or proceeds, product, offspring rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

11 U.S.C. § 543(b).

91.    Notwithstanding this provision, section 543(d) further provides that the Court may excuse compliance with subsection (b) of this section if the interests of creditors would be better served by permitting a custodian to continue in possession, custody, or control of such property. 11 U.S.C. § 543(d).

92.    Thus, section 543(d)(1) permits a receiver to remain in possession, custody, or control of property if it serves the interest of creditors. *See, e.g., Dill v. Dime Sav. Bank, FSB (In re Dill)*, 163 B.R. 221, 225 (E.D.N.Y. 1994); *In re Constable Plaza Assoc., L.P.*, 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991); *In re Polar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989).

93.    In determining whether to excuse the turnover requirements of section 543(b), courts often look to the following, non-exhaustive list of factors:

> (i) the sufficiency of income to fund a successful reorganization;
>
> (ii) the likelihood the debtor will use the turnover property for the benefit of creditors;
>
> (iii) any mismanagement by the debtor; and
>
> (iv) the presence or absence of avoidance issues with respect to the property retained by the debtor.

*See Constable Plaza Assoc., L.P.*, 125 B.R. at 103 (internal citations omitted); *In re CCN Realty Corp.*, 19 B.R. 526, 529 (Bankr. S.D.N.Y. 1982) (denying turnover motion where evidence of debtor's mismanagement of operations was present); *see also Dill*, 163 B.R. at 226 (citing cases

24

where receiver excused from turnover requirement based on the prior neglect and/or mismanagement by the debtor).

94.     The sole concern is the interest of creditors, and a court may excuse compliance with a turnover order even if all factors resolve in favor of a debtor. *See Polar Springs Apartments*, 103 B.R. at 150 (granting motion to excuse compliance with turnover requirement).

95.     As to the first factor, the Debtors have not filed any plan, disclosure statement, or term sheet, and nearly four months into these cases have identified no source of funding to satisfy the approximately $11.9 million in secured debt owed to Lender.  Having the Receiver in place at a minimum protects the remaining funds — which consist entirely of Lender's cash collateral — from further dissipation.

96.     As to the second and third factors, Lender still has serious concerns that the Debtors will continue to operate the Beach Club business and preserve the Property in a fashion consistent with the benefit of creditors, including satisfying the debt owed to Lender, in light of Jacobson's pre-petition misconduct and obstruction.  In fact, it was Jacobson's failure to turnover the Membership Funds that prompted the court in the Foreclosure Action to order the appointment of a Receiver in the first place and move for Jacobson to be held in contempt, among other things.

97.     Importantly, even if the factors favored the Debtors —which they do not— the creditors' interests mandate that the Receiver remain in place.  Given Jacobson's previous behavior on the one hand, and the success accomplished with having the Receiver present and in control of the Debtors' finances on the other hand, keeping the Receiver in place to continue to exercise the duties authorized in the Receiver Continuation Order, and excusing his compliance with section 543, is crucial to ensure that monies remain in the estates and available for payment to legitimate creditors.

25

98.     Accordingly, the automatic stay should continue to be modified so that the Receiver can continue to carry out his duties and responsibilities as set forth in the Receiver Continuation Order, and the Receiver should be excused from turning over property of the Debtors in his possession, custody or control and be allowed to continue to perform his duties in accordance with the Receiver Continuation Order.

<div align="center">

**ALTERNATIVELY, GROUNDS EXIST TO APPOINT A
CHAPTER 11 TRUSTEE IN THIS CASE PURSUANT TO
SECTION 1104(a) OF THE BANKRUPTCY CODE**

</div>

99.     Section 1104(a) of the Bankruptcy Code authorizes the court to appoint a trustee to serve in a chapter 11 case "for cause," or "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(1)-(2).   The appointment of a trustee is an "extraordinary remedy," and, therefore, the movant must prove the need for a trustee by clear and convincing evidence. *In re Ridgemour Meyer Properties, LLC,* 413 B.R. 101, 108 (Bankr. S.D.N.Y. 2008); *see Adams v. Marwil (In re Bayou Grp., LLC),* 564 F.3d 541, 546 (2d Cir. 2009) (noting that the standard under section 1104(a) is "very high"); *In re Ashley River Consulting, LLC,* No. 14-13406 (MG), 2015 WL 1540941, at \*9 (Bankr. S.D.N.Y. Mar. 31, 2015).   While courts usually presume that the debtor is in the best position to operate its business, "this presumption is not absolute." *Ashley River Consulting, LLC,* 2015 WL 1540941, at \*8; *see In re SunCruz Casinos, LLC*, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003) ("[I]n the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." (*quoting In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)) (internal quotation marks omitted)); *see also In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 818 (Bankr. N.D.N.Y. 1989) ("Chapter 11 is not a game to be used for sport against creditors for the benefit of insiders.") (motion to convert).

<div align="center">26</div>

**The Pre-petition Conduct of the Debtor and Jacobson Supports Granting the Relief Requested**

100.    "Cause" to appoint a Trustee under section 1104(a)(1) includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case . . .." 11 U.S.C. § 1104(a)(1).  Additionally, courts consider the following factors (or some variation thereof) when determining whether there is sufficient cause:

> the materiality of any misconduct, the debtor-in-possession's evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors, the existence of pre-petition voidable preferences or fraudulent conveyances, whether any conflicts of interest on the part of the debtor-in possession are interfering with its ability to fulfill its fiduciary duties, and whether there has been self-dealing or squandering of estate assets.

*Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship),* 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011) (quoting *In re Veblen W. Dairy LLP,* 434 B.R. 550, 553 (Bankr. D.S.D. 2010)) (emphasis added).  While the "for cause" determination is discretionary and made on a case-by-case basis, the appointment of a trustee is mandatory once cause is established. *In re Sharon Steel Corp.,* 871 F.2d 1217, 1226 (3d Cir. 1989).

101.    Alternatively, the court may appoint a trustee if doing so is in the interests of creditors and the public. 11 U.S.C. § 1104(a)(2); *see In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).  Factors that guide the court's analysis under subsection (a)(2) include the following:

> (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

27

*Id.* at 168. Subsection (a)(2), provides a "flexible standard," that permits appointment "even when no 'cause' exists." *Id.; see Ridgemour Meyer Properties, LLC,* 413 B.R. at 113 ("Unlike § 1104(a)(1), § 1104(a) (2) does not require a finding of fault . . .."). Because a debtor in possession owes fiduciary duties to the estate, the appointment of a trustee pursuant to section 1104(a)(2) is appropriate when the debtor "suffer[s] from material conflicts of interest and cannot be counted on to conduct independent investigations of questionable transactions in which [it was] involved." *Ridgemour Meyer Properties, LLC,* 413 B.R. at 113; *see In re Microwave Products of Am., Inc.,* 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) ("[B]ecause the debtor is not in a strong posture to pursue possible claims that may have resulted from conflicts of interest and fraudulent transfers, a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate."); *see also In re Eurospark Indus., Inc.,* 424 B.R. 621, 629 (Bankr. E.D.N.Y. 2010) ("It is well established that courts may appoint a chapter 11 trustee where a debtor-in-possession's management has a conflict of interest that interferes with its ability to fulfill its fiduciary duties to the estate."). *See also In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 472-74 (3d Cir. 1998) (affirming appointment of trustee where the "acrimonious" relationship between debtor's management and creditors created an irreconcilable conflict warranting independent fiduciary). Acrimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a Chapter 11 trustee under § 1104(a)(2). *Eljamal v. Office of the United States Trustee (In re Eljamal)*, 2018 U.S. Dist. LEXIS 169658, *18 (S.D.N.Y. Sept. 28, 2018), *citing Eurospark Industries*, 424 B.R. at 630; *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (same), *aff'd*, 2011 U.S. Dist. LEXIS 36476 (E.D.N.Y. 2011).

102.    Evidence of fraudulent pre-petition transfers made by a debtor—especially when for the benefit of "insiders"—is usually sufficient to satisfy a movant's burden under one or both

28

subsections of 1104(a). *See Veblen W. Dairy LLP,* 434 B.R. at 554 (finding cause to appoint a trustee when the debtor, among other things, used its funds to pay down debt owed by a related entity) ("Debtor's and its management team's pre-petition actions were not evenhanded and were primarily intended to benefit insiders and the several affiliated entities, rather than Debtor's creditors."); *Ridgemour Meyer Properties, LLC,* 413 B.R. at 113 (holding, *inter alia,* that the debtor's president was not a proper fiduciary because he could not be expected to investigate and recover transfers from the debtor to insiders, including the president's fiancé); *Microwave Products of Am., Inc.,* 102 B.R. at 676; *In re Bonded Mailings, Inc.,* 20 B.R. 781, 786 (Bankr. E.D.N.Y. 1982) (finding cause for the appointment of a trustee when the debtor transferred assets pre-petition to frustrate creditor in the satisfaction of its judgment); *In re Fiesta Homes of Georgia, Inc.,* 125 B.R. 321, 324 (Bankr. S.D. Ga. 1990) (holding that there were sufficient grounds to appoint a trustee under subsection (2) of section 1104(a) of the Bankruptcy Code because substantial transfers were made to insiders and the debtor's management had a conflict of interest, but ultimately the court converted the case to chapter 7 because the debtor was no longer operating).

103.    Under the foregoing standard, grounds exist under both sections 1104(a)(1) and 1104(a)(2) of  the Bankruptcy Code to appoint an operating trustee in this case.  Based on the historical and continuing conduct of the Debtors and Jacobson, including collecting of Membership Funds in direct contradiction of court Orders in the Foreclosure Action, it is clear that the Debtors will not be able to efficiently administer this case. *See In re 1031 Tax Group, LLC,* 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) ("The appointment of a chapter 11 trustee is authorized upon the showing of cause – inclusive of fraud, dishonesty, incompetence or gross mismanagement of the debtor's affairs by *current management.")* (emphasis not added).

29

104. The principal of the Debtors has violated multiple Orders from the Foreclosure Action. Jacobson has violated the June 16, 2025 Order, the So-Ordered Transcripts, the Order of Reference and the Receiver Order. Approximately $900,000.00 in Membership Funds were collected pre-petition despite numerous and specific directives and orders not to do so.

105. Based upon the Receiver's preliminary investigations into the historical finances of Debtors, it is apparent that Jacobson ignores corporate formalities and treats the Debtors' accounts as his own personal accounts.

106. Besides Carver, and now Lender, being harmed through Jacobson's actions, the innocent Beach Club Members were also at risk of being significantly harmed had the Receiver not been authorized to remain in control. At the outset of this case, Jacobson did not return any of the Membership Funds to the Beach Club Members despite contractually being obligated to do so and by court Orders. Jacobson admitted in his Affirmation filed in the Foreclosure Action that the Debtors are contractually obligated to return the Membership Funds if the Property does not open for the 2026 season. *See* Ex. 1 (Affirmation). Had the Beach Club not opened under the protective custody of the Receiver, besides the contractual obligations to return the Membership Funds, Judge Murphy ordered Jacobson at the August 2025 Hearing to return any deposit that he receives. *See* Ex. 5 (So-Ordered Transcript at pp. 43-44) ("[Y]ou are not to take anymore deposits; and if you get a deposit, you return it."). Despite this unambiguous, straight-forward Order, Jacobson still refused to comply, and was in violation of his contractual obligations, and the court Order.

107. Furthermore, besides the Order to Show Cause filed by the Receiver seeking contempt against Jacobson due to his failure to abide by the court Orders, the court in the Foreclosure Action has also threatened criminal contempt actions against Jacobson. Judge Murphy stated at the August 2025 Hearing, "[b]ut if you continue to take money and these people do not

30

get their money back, I'm going to have a real problem. And I will seek criminal referrals against you. . . I'm not going to let these people be out of pocket." *See* Ex. 5 (So-Ordered Transcript at p. 44).

108. As set forth in the January 2026 So-Ordered Transcript, Judge Murphy was still considering holding Jacobson in contempt due to his failure to abide by court Orders. Judge Murphy stated to Jacobson's counsel, "In my prior order, I directed - - I ordered that your client not collect any rents because there were future rents. Your client did that. . . .I felt that was contemptible, and with your client here I told him exactly how I felt. I told him I was considering sending that over to Nassau County District Attorney and U.S. Attorney because he was collecting funds that he was ordered not to... . I'd like to get this resolved in an amicable way without pursing contempt and without pursuing turning things over to the DA and the U.S. Attorney." *See* Ex. 10 (January 2026 So-Ordered Transcript at pp. 7-8).

109. It is clear that the Debtors' filing of these bankruptcy cases was a scheme to stop the criminal referrals that are justly and imminently coming Jacobson's way, and it is *only* because of the proximity to the 2026 summer season that Lender determined that the best course of action to preserve the Beach Club business, the Mortgaged Property, and its collateral was to consent to opening the Beach Club for the 2026 season provided the Receiver to remain in place and control the Debtors' finances.

110. But, if the Court opts not to keep the Receiver in place, it is this blatant disregard for the law and dishonesty from Jacobson that necessitates a chapter 11 trustee to be appointed. By his actions throughout the Foreclosure Action, Jacobson has made it clear that he will take any action that he deems fit, including violating the law. This pattern of recklessness will not stop now if he is free to operate unchecked as debtor in possession.

111.    It cannot be overemphasized the serious nature of Jacobson's actions thus far.  To date, a firm agreement authorizing the parking of Beach Club members' cars on Boardwalk Empire's premises does not exist, with Jacobson directing NYBC to pay his own Boardwalk Empire entity whatever sum he deemed fit the last several years, resulting in NYBC not having any enforceable rights regarding the parking privileges which is an important component to the value of the NYBC enterprise.  In addition, at the time Carver's loans were being entered into, Jacobson caused both Debtors, upon execution, to immediately breach a representation and warranty contained in the Carver loan documents regarding the undisclosed existence of both Debtors' liability as guarantors of the $5 Million loan made by Newtek to New York Equestrian Center, Ltd. and Lakewood Ranch Estates, LLC, two other insider entities owned and controlled by Jacobson, and for which $5 Million loan the Debtors appear to have received no benefit.  There are too many parties involved who have been harmed, continue to be harmed, and will be harmed in the future if a chapter 11 trustee is not appointed.  This pattern of dishonesty, mismanagement, and preferential treatment of insiders requires that the Debtors' operations be managed by a chapter 11 trustee.  Thus, cause exists to appoint a chapter 11 trustee. *See In re 1031 Tax Group,* 374 B.R. at 86 ("A court may consider both the pre- and postpetition misconduct of the current management when making the determination that 'cause' exists for the appointment of a trustee.").

**Management of the Debtor Will Be Hopelessly Conflicted Mandating the Appointment of a Trustee If the Receiver is Not Continued**

112.    It is also in the best interest of the creditors and the public to appoint an operating trustee under section 1104(a)(2) of the Bankruptcy Code if the Receiver is not continued.  The Debtors cannot be counted on to conduct independent investigations of any transfers to which Jacobson was a party, to fulfill its fiduciary duties to the estate, and cannot be deemed an honest participant.

32

113.    The Court should take notice of three (3) categories of creditors in this case: (i) Lender's secured claim on all of the Debtors' assets; (ii) the $5,000,000.00 unsecured guaranty claim of Newtek[6] and (iii) the collective claims of Beach Club Members.  Based upon the conduct in the Foreclosure Action, Lender has no confidence in the Debtors or Jacobson. It is further submitted, that Jacobson is conflicted from representing the Debtors' estate related to the claims of Newtek or the Beach Club Members.

114.    It is respectfully averred that, if the Receiver is not continued, cause exists to appoint a trustee to investigate any transfers that Jacobson has made.  NYBC's Bankruptcy Petition and Schedules raise numerous concerns.  First, the Debtors list a $5,000,000.00 claim held by Newtek for a guaranty on a mortgage debt.  Second, the Debtors list a pending lawsuit for breach of contract (assumed to be on the guaranty of the Debtors) captioned *Newtek Small Business Finance, LLC v. New York Equestrian Center, Ltd.; Lakewood Ranch Estate LLC; Ocean Blvd., LLC; New York Beach Club, Ltd.; Jacobson Realty, Ltd.,* Index No. 606852/2025 pending in Nassau County Supreme Court.  Finally, the Debtors schedule debt for the benefit of New York Equestrian Center, Ltd. [NYBC ECF No. 1] on account of a loan guaranty.  Upon information and belief, that is an entity owned by Jacobson's wife.

115.    It is respectfully submitted that, if the Receiver is not continued, it is necessary that a trustee be appointed to investigate any and all transfers from the Debtors to or for the benefit of New York Equestrian Center, Ltd. or, frankly, any other entity owned, managed or controlled by Jacobson or his wife.   A trustee needs to investigate whether any transfers were made to Newtek, New York Equestrian Center, Ltd., and/or Boardwalk Empire LLC, and if these transfers constitute

---

[6] The Newtek claim was filed as a secured claim, but it does not appear to be secured by property of either of the Debtors' estates.

33

a fraudulent transfers.  If the Receiver will not be authorized to do so, only a trustee can make an independent finding of a fraudulent transfer; the Debtors certainly cannot conduct an impartial investigation.

116.    It appears undisputed that Jacobson has exhibited untrustworthiness.  The court in the Foreclosure Action recognized this and acknowledged his untrustworthiness multiple times.  At the August 2025 Hearing, when discussing how Jacobson violated the June 16, 2025 Order, Judge Murphy stated, "[a]nd there is a very good chance I will appoint a receiver because you betrayed me.  You showed me I can't trust you and that is a problem for me.  And I want to make sure these people are all protected as well as the plaintiffs and I have real concerns about that." *See* Ex. 5 (So-Ordered Transcript at p. 44).

117.    As set forth in the January 2026 So-Ordered Transcript, Judge Murphy reiterated his distrust for Jacobson to his counsel due to Jacobson's failure to abide by Judge Murphy's Orders. *See* Ex. 10 (January 2026 So-Ordered Transcript at p. 10) ("I'm very serious, and I told him point blank, I didn't trust him, and it's all on the record, and how I was very seriously turning things over to the District Attorney or U.S. Attorney or both, and also, potentially holding a contempt proceeding.").  This character trait of untrustworthiness does not disappear just because the Debtors have filed for bankruptcy, or because Jacobson thus far has successfully opened the Beach Club for the 2026 summer season with the permission of Lender and the Receiver in place.

118.    Based on the foregoing, if the Receiver is not continued, the Debtors cannot and should not be allowed to manage the Beach Club business and the Mortgaged Property or these chapter 11 cases, warranting the appointment of a chapter 11 trustee under section 1104(a)(1) or (a)(2) of the Bankruptcy Code.

34

## ALTERNATIVELY, THE CASE SHOULD BE CONVERTED TO ONE
## UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

119.     If the Court is not inclined to appoint an operating trustee, cause exists to convert the Debtors' case to chapter 7 under section 1112(b)(1) of the Bankruptcy Code which provides, in part, that "the Court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause…" 11 U.S.C. § 1112(b)(1).

120.     As set forth in section 1112(b)(4), the Bankruptcy Code provides sixteen examples of "cause" for conversion or dismissal, but the list is not exhaustive[7]. As such, "courts have also determined that conversion or dismissal of a Chapter 11 case is warranted for other reasons, including the debtor's inability to effectuate a plan . . .." *In re Babayoff,* 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); *see In re Van Eck,* 425 B.R. 54, 59 (Bankr. D. Conn. 2010) ("The court will be

---

[7] The other statutory examples of cause are as follows:

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).

4912-4513-5278, v. 8

able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." (citation and internal quotation marks omitted)).

121.    Here, the same cause that exists to appoint a chapter 11 trustee, as well as other grounds, supports conversion of the Debtors' cases to chapter 7 of the Bankruptcy Code. Jacobson has repeatedly violated court Orders, as set forth above. There is no reason to believe that he will not continue to do so during the pendency of these chapter 11 cases absent oversight of the Debtors' finances. The same self-dealing, dishonesty and lack of transparency that supports an operating trustee equally supports conversion. To avoid prejudice to the Beach Club Members who have already paid their 2026 membership dues and expect a complete summer season, Lender respectfully requests that any conversion to Chapter 7 be made effective no earlier than September 8, 2026 (the day after Labor Day), permitting the Beach Club to complete its 2026 summer season under Receiver oversight before conversion takes effect.

122.    Although section 1112 of the Bankruptcy Code provides that the Court may either dismiss or convert a case, whichever is in the best interest of creditors, Lender submits that here, conversion is warranted. Either a chapter 11 trustee or a chapter 7 trustee can sell the Mortgaged Property and pay the debts due. The Debtors should not be able to continue their obstruction of Lender's rights.

123.    For all these reasons, in the event the Court is not inclined to authorize the continuation of the Receiver or appoint an operating trustee in the Debtors' cases, cause exists to convert the Debtors' cases to cases under chapter 7 of the Bankruptcy Code.

## CONCLUSION

124.    As demonstrated above and in the affidavits filed in connection with this Motion, this Court should: (i) continue to excuse the Receiver from compliance with section 543 of the Bankruptcy Code to carry out his current duties as set forth in the Receiver Continuation Order,

36

and continue to modify the automatic stay to permit the Receiver to maintain control over the Debtors' finances; or, alternatively, (ii) appoint an operating trustee in the Debtors' cases pursuant to section 1104(a) of the Bankruptcy Code; or, alternatively, (iii) convert the Debtors' cases to cases under Chapter 7 of the Bankruptcy Code pursuant to section 1112(b).

**WHEREFORE,** Lender respectfully requests that the Court grant the relief sought herein, including the entry of the proposed bridge order annexed to the Feuerstein Declaration as Exhibit "14", together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
June 5, 2026

KRISS & FEUERSTEIN LLP

By: */s/ Jerold C. Feuerstein*
Jerold C. Feuerstein, Esq.
Andrew S. Muller, Esq.
Christopher Palmieri, Esq.
360 Lexington Avenue, Suite 1200
New York, NY 10017
(212) 661-2900
jfeuerstein@kandfllp.com
amuller@kandfllp.com
cpalmieri@kandfllp.com

37