MICHAEL SEPE, ESQ.
Michael Sepe, LLC
41 Front Street, Second Floor
Rockville Centre, New York 11570
Phone: (516) 766-0477
ms@sepelaw.com
*Court Appointed Receiver*

Hearing date:   July 23, 2026
                at 10:00 a.m.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| NEW YORK BEACH CLUB LTD., | Case No. 26-70576 (LAS) |
| Debtor. | |
| In re: | Chapter 11 |
| OCEAN BLVD., LLC, | Case No. 26-70577 (LAS) |
| Debtor. | |

**RECEIVER'S RESPONSE TO THE OBJECTION BY DEBTORS
TO RECEIVER'S SECOND FEE APPLICATION**

Michael Sepe, Esq. as Temporary Receiver ("Receiver") of both New York Beach Club

Ltd. ("NYBC") and Ocean Blvd., LLC ("Ocean Blvd." and together with NYBC, the "Debtors"),

the above-referenced debtors and debtors in possession, submits this response to Debtors'

objection (hereinafter, the "Objection") to Receiver's Second Fee Application (the "Fee

Application") seeking entry of an Order awarding compensation for services rendered from

May 1, 2026 through June 30, 2026 in the amount of $71,300, incurred in his work as Receiver

of the Debtors, and respectfully represents as follows:

1.  Debtors' Objection does not question the veracity of the billing entries, the quality of the work or the necessity of the work described.

2.  Rather, Debtors take issue with the billing format (though they already consented to such format), question whether some unspecified portions of the work were "clerical," "administrative," or capable of being performed by other unknown individuals, or should not be chargeable to the Debtors' Estates, because such work involved "third parties" and that work involving these ".. other non-estate parties should not automatically be charged to the bankruptcy estates." *See* Objection at 13.

3.  It must be noted that Debtors' Objection contains multiple statements that are materially misleading.  As such, it cannot be sustained as a suitable objection to the Fee Application and should be overruled.

4.  For the sake of clarity, the Receiver's responses are separated into categories.

### Billing Requirements

5.  At the time of my appointment this Court:

> ORDERED, that the Receiver shall keep contemporaneous time records of all work performed in this matter.  Subject to the approval of the Court, Receiver shall be compensated at an hourly rate of $500.00 for Michael Sepe and an hourly rate of $75.00 for paralegal staff.  The Receiver may apply to the Court, on a bi-monthly basis, for payment approval, with such compensation to distributed from the funds in the Debtors accounts held by Receiver; and is further…

*See* Order at ECF 81.

6.  As required by the Court, I have maintained contemporaneous time records of my services performed herein as the Receiver.

7.  Specifically, because of the large number of discrete tasks required for this matter, all time entries are generated daily and on the same date as the work described.

2

8.   Unlike a litigation where days later a time entry for a motion, letters, etc. can be easily recorded, the large number of daily calls, emails and meetings that take place here, which often include various combinations of communications with the four attorneys on this matter, Debtors' principal, Debtors' employees, the hospitality advisor, the Office of the United States Trustee (the "USTO"), beach club members, vendors, and others, require that time be recorded contemporaneously.

9.   As such, all of the entries on the Receiver's submitted time records were written on the date of the entry itself.  As the Court will note, every referenced phone call and email reflects the multiple subjects covered thereby.

10. This level of detail is provided so that all parties and this Court are apprised of the work I am doing and it also creates a diary of events for my later reference.

11.  No other requirements as to billing format were requested by Debtors or any other party at the time of my appointment.

12.  More importantly, on May 9, 2026, prior to the filing of my first Fee Application for the period of time beginning mid-February through the end of April, I gave an advance copy of my first invoices to all parties, including the USTO and counsel for the Debtors. *See* **Exhibit A.**

13. At that time there was no objection to my time keeping entries or the format of my billing.

14. Thereafter, when the first Fee Application was later filed with the Court, Debtors' counsel, along with the USTO and counsel for secured creditor consented to the application without any objection and without any request for a change in billing format.

15. The billing format of the invoice currently before the Court in this Second Fee Application is identical to the format in that initial set of invoices approved by Debtors.

16. Considering Debtors' failure to object when given an advance copy of Receiver's time entries and then again when the First Fee Application was submitted for approval to this Court, their characterization now, for the first time of Receiver's "… extensive block billing which prevents meaningful review" is perplexing.  *See* Objection at 8.

17. It is respectfully submitted that the level of detail of the daily time entries does in fact allow "meaningful review" by the Court as to the work performed every day on this matter by me in my capacity as Receiver.

18. Prior to the Debtors' current Objection, at no time since the date of my appointment in February 2026 have the Debtors or any other party made any request that I alter this format.

19. Finally, the Debtors' citation to Justice Murphy's "up to" $500 per hour is similarly misleading as Justice Murphy in fact approved $500 per hour for my pre-petition work as did this Court in its Order of appointment.  *See* Order at ECF 81 at pg. 6.

### Fee Allocation Between the Two Debtors

20. Next**,** in their Objection, Debtors conspicuously argue that ". . . there is no breakout of those tasks as between which of the Debtors the issues relate. Thus, the current invoice does not meaningfully allocate the charges among the separate estates …." *See* Objection at 13.

21. Debtors' counsel apparently fail to remember that I raised this very issue prior to filing my first Fee Application.

22. On May 12, 2026, a Microsoft Teams meeting was held with the attorneys for the Debtors and the Secured Creditor which covered multiple topics including how to allocate fees between New York Beach Club and Ocean Blvd.

23. During that call, all counsel specifically agreed with my suggestion that 70% of work be charged to NYBC and 30% be charged to Ocean Blvd. so long as approved by the USTO.

24. That same night I emailed all parties an updated fee motion with that specific allocation and citing that specific call and agreement.  *See* **Exhibit B**.

25. Thereafter, the proposed 70% / 30% allocation was discussed in Court, on the record, with Debtors' counsel present, in order to vet the question with Judge Scarcella *prior* to filing the first fee application where once again Debtors had no complaint and did not dispute that the issue had already been discussed with all counsel in advance of that Court date.

26. Thus, though Debtors' counsel had numerous opportunities, not once did they raise an objection to the allocation of costs, which was subsequently approved by the USTO, followed by Debtors' consent to the Fee Application itself.

27. The current Fee Application seeks exactly the same allocation as previously consented to by the Debtors.

28. Similarly, while Debtors point to a typo where the 2 numbers were mistakenly transposed (objection at introductory paragraph) in the notice of my application, they conveniently fail to mention that the fee application itself at paragraph 17, which not only correctly states the previously agreed upon allocation, but also repeats the justification as to how work for the Debtors is inextricably intertwined and cannot be practically segregated.

29. In light of the above, Debtors' Objection as to this topic is particularly specious.

**Block Billing**

30. In this particular matter, what Debtors criticize as 'block billing' is particularly appropriate.

31. First, as the Court will note, and by way of example, on the first large entry dated May 5, 2026, I was required to participate in or initiate eleven (11) separate phone calls in addition to thirteen (13) additional emails and texts. Those items were separate and apart from tasks such the weekly payments to vendors after review of invoices.

32. Under the newly sought format by Debtors, I would have been required to check a time meter for each phone call or email to itemize each separately. While that is not burdensome for longer tasks, the sheer number of daily calls, emails, zoom conferences and meetings, with four attorneys, the Debtors' principal, Debtors' employees, vendors, bank employees, beach club members, municipal officials, and others would result in additional work to electronically calculate the time for each such contact and log it. A summary of the daily work performed is shown in **Exhibits C and D**.

33. Because of the number of items required in a given day, and the constant overlap and switching of tasks, doing so would, in my estimation, add to my daily work.

34. In addition, the approach now suddenly urged by the Debtors would distort the accuracy of the time record, would actually add to the daily time expended and result in what is colloquially referred to as 'billing for billing' daily for each entry.

35. "Block billing is not prohibited in this Circuit, as long as the Court can determine, from context, the overall reasonableness of the total hours claimed." *Wilmington Tr., Nat'l Ass'n v. Winta Asset Mgmt. LLC*, 2024 U.S. Dist. LEXIS 159447, at *11 (S.D.N.Y. Apr. 18, 2024) (citation omitted).

36. Here, I am the sole appointed Receiver.  I individually record for each task I perform.

37. It is respectfully submitted that my entries "provide sufficient detail about each task for the Court to determine that the total amount of time devoted to those tasks is reasonable." *Tabatznik v. Turner*, 2016 U.S. Dist. LEXIS 42972, at *38 (S.D.N.Y. Mar. 30, 2016).

38. In its analysis of Receiver's time keeping, "'[t]he court is not required to assess each entry in isolation; rather, it may use its knowledge of the case and the demands that the issues posed by the case placed on the attorneys to judge whether counsel were wasting significant amounts of time or otherwise performing with less than reasonable efficiency.'" *Zimmerman v. Portfolio Recovery Assocs., LLC*, 2013 U.S. Dist. LEXIS 174182, at *34-35 (S.D.N.Y. Dec. 11, 2013) (citations omitted) (holding that there was no reduction for "block billing" where the descriptions of the services provided were sufficient" to "allow the Court to evaluate the reasonableness of the hours expended").

39.  It is noteworthy that Debtors fail to fully quote a single one of my time entries and actually represent and purportedly quote entries that are seemingly just their own summaries of Receiver's billing entries.

40.  Debtors' counsel claims to be quoting Receiver's May 6 time record when they quote that Receiver's May 6 entry charges for:

> check preparation, scanning, UPS activity, numerous calls and emails, bank-account formation, parking issues, tax matters, payroll communications and worker's compensation matters.

*See* Debtors' Objection at para. 9.

41. The Receiver is not sure what the Debtors are quoting from, however, the following is the Receiver's <u>actual</u> time entry:

7

Review updated invoices from debtor, cut checks to mgmt. employees and vendors, combine w invoices, scan and send same to all parties, call with Palmco, @UPS to send checks (2 batches0, email to parties, calls with R MCCord and A Muller re Sare payments, call with Ellen Kroll re refunds req, email from same w docs, multiple calls and emails with Dime, AM, J Blisko and A Muller re same, calls and emails with Joshua Spinella and Corrado S at branch re same, rec corp docs from debtor re opening of Ocean Blvd acct, send to Dime for acct opening, email to R Nosek re parking space rentals, call with AM re same, email to AJ re tax bills, new account opening etc. texts with Jill Kaplan re dropoff of checks for deposit and payroll, email to AJ w UPS receipt, send wire forms to Dime, email to AM re parking issue, email to AM and RM re SARE payment being on behalf of Ocean Blvd., email re payment of taxes and methods for same by May 11th date, email AJ re WCB non-invoice, email to all counsel and USTO re parking lot issue.

4.80 hours

42. The Debtors again claim to be quoting the Receiver's time entry for June 5. However, this is the Receiver's actual June 5 time entry:

Call with Alina S, review latest bills, call with Alina re same, email from AJ re support for Kaplan commission claim, responsive email to same, call with AJ re Kaplan and claimed historical support, emails with M Legge, call with A Muller, issued payments 218-230, meet with Oleg Jacobson, execute checks 31-71, deliver deposits to Dime, emails with Dime re check cashing and new payroll checks, calls from Jill Kaplan, email from AJ accusing me of procrastinating, email from R Nosek re response as to Boardwalk Empire insurance, review changes to agreement, rec and rev SD objection to extension of time, send shared drive link to M Legge, email to all with copies of checks, deposits and payroll, email to Alina re unsigned check, rev login credential sent today for Square and Homebase, emails to R Nosek and Brandon Raymar re ins coverage questions.

43. And unlike the Debtors' Objection – this time entry is for 3.90 hours – not 4.6 as "quoted." *See* Objection at para. 9.

44. Finally, Debtors' questions as to the scope of my work are also misleading.

45. The original Receiver Order charges me "… with all decisions concerning the management and financial operation of the Debtors, and approval of payment requests of the Debtors, shall me be made solely by Receiver, …" Order at ECF 81, pg. 4.

8

46. As such, it is unclear what Debtors contend could be delegable.

47. Clerical work is done by my assistant of nine years and has not been charged for in this matter, despite my assistant spending hours over the last two months performing paralegal type work like assembling and categorizing bank statements underlying phase I of my report.  I did not seek to charge for that work because although she does paralegal tasks for me, she does not possess a paralegal certificate.

48.   Payroll reports and vendor invoices are grouped and sent to me weekly by Alina Semenova, Mr. Jacobson's assistant. I meet with Mr. Jacobson weekly to review and sign all requests for payment and discuss operations and sales of units whereupon I give him payroll and vendor checks and collect his deposits (new sales checks and restaurant cash).   I do make those deposits personally at a bank less than a mile from my office where I typically handle issues or needs regarding the 5 sub accounts with the branch manager in person.  Admittedly, on certain days where my assistant is not in, I have scanned copies of vendor checks myself.  I believe that has happened twice.

49. Unlike a Chapter 11 Trustee, I have no authority to hire any additional professionals.  As a result, I am my own "bookkeeper," accountant, forensic investigator etc. Further, the monthly accounting I was tasked with by Justice Murphy, because of the nature of NYBC, has turned into a weekly accounting. *See e.g.* **Exhibit E**.

50. There has been no instance of my having performed work which was a "duplication" or work performed by the hospitality manager or NYBC staff.   It is noteworthy that Debtors' Objection does not so much as cite one specific claim of such actual duplication despite the pages of detail in their possession and access to the very people they name.

51. To that point, thankfully there is a record of the amount of work actually caused by Debtors' actions.  Specifically, on April 21, 2026, I wrote to Debtors' counsel specifying the issues Mr. Jacobson's own conduct was causing. *See* **Exhibit F**.

52.  This was raised again in detail, on June 7, 2026, where I noted:

> Far too often, Mr. Jacobson responds to information requests with curt direction to the shared drive and the hundreds of documents in our possession.  Significant time is spent, repeating the requests and engaging in searches that do not yield the promised results which unnecessarily takes time from other needed tasks.  At the same time, when it suits him, Mr. Jacobson seems to understand how to cite to or gather specific information in support of his payment requests.  This patten of crisis last minute demands, followed by insufficient information in support of the demands, followed by complaints about the time spent addressing them, is becoming tiresome and unnecessarily increasing billable time.

*See* **Exhibit G** at pg. 2.

53. That email ended with a request that "Any assistance with correcting the pattern described above would be greatly appreciated." *See id.* at pg. 4.

54. Finally, while the objection fails to mention it, a substantial portion of the most recent invoice involves hours spent on the investigative report which all parties have repeatedly stated is part of my charge.  Phase I of that report is a spreadsheet analysis of the flow of member deposit monies from NYBC member deposits to others including Mr. Jacobson, and other entities wholly owned by him both related and unrelated to NYBC.  While under no obligation to do so, I released an advance copy, followed by a revised copy of same to Debtors' counsel for their review and comment.  *See* **Exhibit H**.

55. It is respectfully submitted that Debtors' new-found Objection following the release of that portion of the report is not coincidental in light of Debtors' prior actions and positions on the topic of Receivers' fees.

**Work Relating to Other Entities**

56. Debtors' arguments on this point are particularly vexing. *See* Objection at 12-13.

57. Literally all work involving other entities was, (i) either specifically caused by Debtors' actions and/or specifically requested by Debtors, (ii) performed cooperatively with Debtors' counsel, and (iii) in most cases related to entities also solely owned by Alex Jacobson, the sole principal of both Debtors.

58.    By way of example, Boardwalk Empire, LLC ("Boardwalk Empire") is a Jacobson-owned entity that owns the parking lot adjacent to NYBC and is a defendant in a state court foreclosure proceeding initiated by a different lender (the Debtors are not parties to that foreclosure action but Jacobson is a defendant-guarantor).

59. In a conversation at which Debtors' counsel was present, Jacobson stated that unless I released funds from the Debtors to Boardwalk Empire NYCB club members "aren't going to have anywhere to park."

60. Despite the ridiculous nature of the threat implied by Jacobson's comment, I ultimately concluded Boardwalk Empire was in fact providing a service to NYBC for which it should be paid, irrespective of who owns it and regardless of the fact that it was in foreclosure without bankruptcy protection.

61. The issue was hotly contested by secured creditor, and the subject of multiple calls and zoom meetings.   I also orally briefed this issue in open court and previewed my decision with Judge Scarcella.  Following that, I actually worked with one of Debtors' attorneys on a licensing agreement thereby addressing and resolving the matter of those payments – for the benefit of Debtors.

62. Next, Debtors question work relating to the Village of Atlantic Beach ("VAB")– the municipality where NYBC is located.  I received an unsolicited phone call from the

11

Mayor of Atlantic Beach who told me that he was directed to me by Mr. Jacboson. In essence VAB demanded NYBC pay for the installation of a barrier between NYBC and VAB property. In response to this demand, I asserted NYBC's rights under federal law/bankruptcy law and pointed out certain problems with VAB's position. *See* **Exhibit I.** This resulted in a reduction of VAB's monetary demand and was followed by revisions to, and the execution of, a settlement agreement which I worked on *with Debtors' counsel*.

63.    Further, it is my recollection that both I and Debtors' counsel needed to follow up with Mr. Jacobson 3-4 times to obtain his signature on that agreement, which was ultimately provided days after the due date for the payment.

64. As another item, at the inception of this matter, in calls with Debtors' counsel, I was also asked to help resolve issues concerning NYBC's liquor license, which is obviously needed to enhance the profitability of NYBC's operations.

65. Additionally, as the Court recalls, this matter began immediately after I moved to have Mr. Jacobson held in contempt in New York state court when he refused to disclose the location of member deposits or to turn them over.

66. Based on my own investigation after speaking with multiple NYBC members, I issued a subpoena and restraining notice which resulted in $187,000 in member deposits being discovered in a previously unknown account. As a result of that restraining notice, I was informed by Debtors' counsel that a personal account of Mr. Jacobson was restrained for which they requested release. After investigation as to whether member funds (deposits) had been diverted to that personal account, I honored Debtor counsel's request and asked JPMC to release the restraint on Mr. Jacobson's personal account.

67. Finally, "individual member disputes" were all necessarily routed to me by Mr. Jacobson, as I was the only one authorized to issue refund checks.

68. Clearly, Debtors' position that work by me as Receiver pertaining to "non-Estate parties" should not be charged to the Debtors' Estates, lacks any merit.  If it did, then by the same logic Debtors' counsel will not seek to be compensated for the work they performed in cooperation with me involving Boardwalk Empire, VAB, NYS liquor authority, etc.

69. The Debtors demanded the work, collaborated to resolve the issues, and now object to the resulting fees. This objection is not just groundless; it is a bad-faith contradiction that should not be given any consideration by the Court.

Dated:  Rockville Centre, New York
　　　　July 22, 2026

                              Respectfully submitted,


                        By:  /s/Michael Sepe_____
                              Michael Sepe, Esq.
                              41 Front Street, Second Floor
                              Rockville Centre, New York 11570
                              (516) 766-0477
                              ms@sepelaw.com

                              *Michael Sepe, Court Appointed Receiver*