## Michael Sepe

| | |
|---|---|
| **From:** | Michael Sepe <ms@sepelaw.com> |
| **Sent:** | Thursday, July 16, 2026 5:15 PM |
| **To:** | 'Robert D. Nosek' |
| **Subject:** | RE: Jill Kaplan: Commission Payment - 15K |

Appreciate the time you spent looking into this – but it underscores how you should not have been required to in the first instance.

Will give you a call in the am.

### *Michael Sepe, Esq.*


**MICHAEL SEPE, LLC**
ATTORNEYS AT LAW

41 Front Street, Second Floor
Rockville Centre New York 11570
T: 516.766.0477 | F: 516.766.3618
ms@sepelaw.com | www.sepelaw.com

PLEASE TAKE NOTICE: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you receive this transmission in error, please contact the sender immediately and delete the material from any computer.

**From:** Robert D. Nosek <RNosek@certilmanbalin.com>
**Sent:** Thursday, July 16, 2026 7:47 AM
**To:** Michael Sepe <ms@sepelaw.com>
**Subject:** FW: Jill Kaplan: Commission Payment - 15K

Hi Mike. I found the below email. There may be more in depth emails or notes from conversations occurring before that, but it appears that the $15,000 was tied to an approximate amount collected, not the more specific $1.6 million that was collected which is the basis of the audit/investigation. I was thinking about it and the verification of paying members from June 1 to the beginning of July, is in the June bank statements. I see that in June $95,318.25 was deposited into 2470 from Intuit, with a $20,875.00 "Deposit" (assuming a check (but could be a member check or if you still issue any cross-account checks); and $70,522.93 was deposited into 2413, but with unknown origins. I do not know which account you have been depositing member checks into. Assuming all those deposits were tied to membership collections (residual amounts due or new memberships after the start of the season), those amounts total $186,716.18. That is below the 1% amount sought by Jill. So, if you ultimately take the position that the $15,000 was paid for all commissions earned through that date, the current request is too high. However, if you agree that the "finality" of how we got to the $15,000 amount was not 100% clear, then Alex's current full-year math does make sense. It is true, he did not share the granular specific amount of the prior commission payments last year. Neither did Jill. But Jill, by submitting the invoice in the amount she did does lock her in to an acknowledgement of prior payment. That is because Alex and Jill are standing on the firm sale number of $2,224,975.74. 1% of that amount would be $22,249.76. She has conclusively been paid $15,000.00 leaving a balance owed of $7,249.76. She is only seeking approximately $2,500 (don't have the exact figure in front of me, but I think you will get the point) which is an acknowledgement by Jill that she was already been paid approximately $4,750.00 last year toward commissions. I believe that there is sufficient information to justify payment of this invoice, while making it clear that, at the least, it is final

1

for any and all sales with corresponding collections made through July 7, 2026 which is the date Alex identified as the end period.

Thoughts?

Best regards,

Rob



**Robert D. Nosek, Esq.**
**Certilman Balin Adler & Hyman, LLP**
**90 Merrick Avenue, 9th Floor**
**East Meadow, NY 11554**

☎ Direct 516.296.7171 | ☎ Firm 516.296.7000 | 🖨 Fax 516.296.7111

✉ Email: mailto:rnosek@certilmanbalin.com | my profile | www.certilmanbalin.com

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail, delete and then destroy all copies of the original message.

**From:** Michael Sepe <ms@sepelaw.com>
**Sent:** Sunday, June 7, 2026 6:43 PM
**To:** 'Andrew S. Muller' <amuller@kandfllp.com>; 'Christopher Palmieri' <cpalmieri@kandfllp.com>; Robert D. Nosek <RNosek@certilmanbalin.com>; RICHARD McCORD <rmccord@certilmanbalin.com>
**Subject:** Jill Kaplan: Commission Payment - 15K

External Email: Proceed with caution!

All: as you know there was an issue with regard to paying Jill Kaplan a $15,000 commission payment.

On May 26th Mr. Jacobson requested I pay 15K to Ms. Kaplan representing 1% commission for an estimated 1.5 million in sales and presented me with an invoice he asked that I pay that day. This payment is separate from her $1500 weekly salary. While this had been mentioned previously my requests for adequate support for this debt did not receive a response.

On May 29th, in response to my question about previously required 1099 agreements for employees such as Ms. Kaplan, Mr. Jacobson stated that Ms. Kaplan's contract was contained on the shared drive. When we searched the shared drive together the contract was not present. Mr. Jacobson emailed it to me later that day – which was the first time I saw it.

As per our attorney meeting reviewing the contract on June 2nd, the contract is undated and by its terms states that is for a period covering March 2026 – September 2026. Ms. Kaplan and Mr. Jacobson both confirmed no such contract existed in prior years and that the contract was created in response to the demand that 1099 agreements be executed for people such as Ms. Kaplan. In speaking with Ms. Kaplan and Mr. Jacobson it became clear that the commission

2

payment was in part for work performed by Ms. Kaplan in 2025 for revenues received at various times for the 2026 season.  It also became clear that no written calculation was done regarding the exact amount of sales but rather, when Mr. Jacobson estimated 1.5mm in memberships had been sold due to Ms. Kaplan's efforts, that he promised her 1%.

At the end of the attorney meeting a request was made for historical backup in support of this arrangement.  While it was not provided, Ms. Kaplan (who became emotional) and Mr. Jacobson contacted me numerous times repeating the request it be issued.

On June 3rd Mr Kaplan cited to Zelle records (from banking statements) and prior years P&L.

Time was spent reviewing both and neither banking records nor the P&L evidenced dedicated commission payments.

In a conversation with Mr. Jacobson on June 5th, he referred me to prior pay records for Ms. Kaplan during past summer months where her base salary was higher (typically by hundreds).  Mr. Jacobson explained that despite the request for a bulk commission payment, historically, Ms. Kaplans salary varied week to week during peak months – thus supporting claims of promised commissions.  In other words, it became clear that there is no historical backup for a bulk commission payment as there is no document calculating the 1%.  According to Ms. Kaplan and Mr. Jacobson this arrangement has been ongoing for the last 8-9 years.

When I asked Mr. Jacobson why for this year, similar to past years, Ms. Kaplans salary was supplemented in the same way, he explained that he did not intend to pay Kaplan this commission if the club did not open.

Regardless of the above, I do believe Ms. Kaplan was promised that amount, that she has worked for months in reliance on that promise, and that commission is part of her compensation.  Therefore, I issued her the 15K check.

The purpose of this email is to 1) explain the reasoning for this decision and 2) once again request assistance from debtor's counsel as this type of situation is emblematic.

Far too often, Mr. Jacobson responds to information requests with curt direction to the shared drive and the hundreds of documents in our possession.  Significant time is spent, repeating the requests and engaging in searches that do not yield the promised results which unnecessarily takes time from other needed tasks.  At the same time, when it suits him, Mr. Jacobson seems to understand how to cite to or gather specific information in support of his payment requests.  This patten of crisis last minute demands, followed by insufficient information in support of the demands, followed by complaints about the time spent addressing them, is becoming tiresome and unnecessarily increasing billable time.

Mr. Jacobson's actions with regard to Mr. Legge and Polaris will be the topic of a separate email.  Debtors counsel appropriately intervened in that situation and at least caused repeatedly

requested information to be given to Mr. Legge, which I appreciate.   Any assistance with correcting the pattern described above would also be greatly appreciated.

Thank you.

Regards,

*Michael Sepe, Esq.*



MICHAEL SEPE, LLC
ATTORNEYS AT LAW

41 Front Street, Second Floor
Rockville Centre New York 11570
T: 516.766.0477 | F: 516.766.3618
ms@sepelaw.com | www.sepelaw.com

PLEASE TAKE NOTICE: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you receive this transmission in error, please contact the sender immediately and delete the material from any computer.